744 F.2d 1260
 Carlos S. SOTO and Robert DeMallory on behalf of themselves
and all others similarly situated, Plaintiffs-Appellees,
v.
Walter J. DICKEY, Donald Clusen, and Gerald Heeringa,
Defendants-Appellants.
Carlos S. SOTO and Robert DeMallory on behalf of themselves
and all others similarly situated, Plaintiffs-Appellees,
v.
Walter J. DICKEY, Donald Clusen, and Gerald Heeringa,
Defendants-Appellants.
 Nos. 83-2380, 83-2381.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 11, 1984.
Decided Sept. 20, 1984.
As Amended Nov. 2, 1984.
 
 1
 Peter L. Gardon, Whyte & Hirschboeck, Milwaukee, Wis., for plaintiffs-appellees.
 
 
 2
 John R. Sweeney, Wis. Dept. of Justice, Madison, Wis., for defendants-appellants.
 
 
 3
 Before FLAUM, Circuit Judge, PELL, Senior Circuit Judge, and KELLAM, Senior District Judge.*
 
 
 4
 KELLAM, Senior District Judge.
 
 
 5
 Alleging violation of their constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution, and of Rules and Regulations of the Waupun Correctional Institution through the improper use of mace, a trade name for tear gas, and similar chemical agents, in the adjustment center at said institution in the State of Wisconsin, Carlos S. Soto and Robert DeMallory (Mallory) instituted a class action pursuant to 42 U.S.C. Sec. 1983, Appeal No. 83-2380, for injunctive and declaratory relief. Carlos S. Soto, also instituted a separate action for damages, injunctive and other relief, Appeal No. 83-2381, pursuant to 42 U.S.C. Sec. 1983, for an alleged unlawful macing on December 13, 1979. The incident complained of by Soto in his damage action is also one of the incidents forming a part of the complaint in the class action. The named defendants were the administrator of the Wisconsin Division of Corrections, Superintendent of the Waupun Correctional Institution (WCI) and Assistant Superintendent of Security at WCI, and their replacements. Tried to the court, it rendered its decision on June 29, 1983, granting declaratory and injunctive relief in each action, but denying damages to Soto. The trial court held that the defendants' policies and practices relating to the use of chemical agents in the Adjustment Center (AC) at WCI violated plaintiffs' constitutional rights under the Eighth and Fourteenth Amendments of the United States Constitution and were in violation of the Division of Corrections Administrative Regulations, Chapter HSS 306.08. The court issued an injunction restricting the use of chemical agents against inmates, except in specific circumstances set forth in its order. In the action for damages, the trial court held that a good faith immunity defense was available to defendants and declined to award damages to Soto.
 
 I.
 
 6
 WCI is a maximum security prison, designed for 810 inmates, but having a population of some 1100 or more during the period in question. The AC, the major segregation facility within the prison, contains 67 cells, 59 of which are arranged in two tiers on the main floor, with the remaining eight cells in the basement. Fifteen of the cells have a wooden outer door in addition to the iron bar doors, and are referred to as double door or wooden door cells. A wire mesh cage in the AC, approximately four feet square and 10 feet high, is used for conducting a strip search of inmates. Inmates are sent to the AC from the general population because of violation of prison rules, such as possession of contraband, theft, refusing to go to work, fighting with prisoners or staff, disobeying rules and refusing to obey orders. Because the average population in the AC during the course of this case numbered about 80, inmates were, at times, double-celled. The AC in this maximum security prison has been described as the "end of the line."
 
 
 7
 When mace is used, it is sprayed from a canister approximately two inches in diameter, about five and one-half inches high and contains approximately four and one-half ounces, the equivalent of approximately 35 one-second bursts. It vaporizes upon contact with the human body or other surfaces. From January 1979 until the middle of November 1982, about 130 macing incidents occurred in the AC, or about 2.7 macings per month. Whenever mace is used, a written report of its use must be made by the correctional officer, giving information regarding its use and the reasons therefor. These reports are reviewed by the Assistant Superintendent, or in his absence, by one designated by him. Only a supervisor may authorize the use of mace, and he is usually the one summoned from outside of the AC. He must be on the spot to authorize its use. While excessive or improper use of a chemical agent can cause some injury, during the four and one-half years of use in the AC there is no evidence in the record or documented at WCI or the AC showing any serious or permanent injury from the use of a chemical agent. Inmates will generally experience itching, irritation or discomfort for a period of time from its use, but washing with water will generally alleviate any discomfort. The procedure prescribed following the use of mace is to have the inmate shower, have his eyes rinsed out, and change his clothing. This usually gives immediate relief of any discomfort.
 
 II.
 
 8
 Without exception, the institutional officials and officers were of the opinion that the use of mace was much more humane and effective than a flesh to flesh confrontation with an inmate. That is, whenever it is necessary to move an inmate from his cell or for an officer to enter the cell, the procedure used is to have the inmate come to the front of the cell and be handcuffed so that he can be better controlled if he is to be moved, or if the officer needs to enter the cell. If he refuses to come to the front of the cell to be handcuffed, there are few options open to the institution, one is that three or four guards, suited up in Emergency Response Unit gear (ERU), must enter the cell and physically overpower the inmate and place him in handcuffs. Experience at WCI established this often resulted in serious injury to staff or inmate, or both.
 
 
 9
 Gerald Heeringa, Assistant Superintendent in Charge of Security at WCI, was responsible for designing and implementing the chemical agency policy upon his return to WCI in 1977. During 11 months of 1977, there were forty one serious assaults on correctional officers, and numerous inmates and staff were injured. Heeringa, along with Superintendent Israel, Major Kahelski and others testified, without contradictions, that since the use of a chemical agent, rather than physical force, the number of assaults upon and injuries to staff and inmates had been drastically reduced. In fact, the threat of the use of mace, except in a few instances, brings about compliance and in most instances, avoids any necessity of physical force.
 
 
 10
 The district court found that the inmates see the use of mace as a serious form of force, while the institution sees it as a substitute for actual physical force and the most humane and least harmful method of dealing with obstinate and dangerous inmates. The fact is, that in most instances where mace was used, the inmate immediately complied with the order from the officer, whether it was to be handcuffed in order to remove him from his cell or for other action. The officer was thus permitted to perform his duty without physical confrontation between staff and inmate. In some of the instances complained of by the plaintiffs, they had told the officers they would not comply with the order unless they were maced, and when maced, they immediately complied.
 
 
 11
 The institution is well aware of the need for concern in dealing with the inmates in AC. Fortunately, as the trial court found, most of the inmates sent to AC serve their stay and are returned to the general population. A few create most of the problems. Over more than a four year period mace was used only 130 times or two and a fraction times a month, and without a single serious injury.
 
 III.
 
 12
 The provisions of the Wisconsin Administrative Code, Chapter HSS 306, deals with security at its institutions of confinement. Subsection HSS 306.08 prescribes that chemical agents may be used only to subdue an inmate who poses an immediate threat of bodily injury or death to another or to regain control of the institution or a part of it. In confined or close areas only CN or CS chemical agents and canister dust chemical agent may be used, and the manufacturer's safety instructions must be followed. The use must be authorized by the Superintendent, and may only be discharged by a correctional officer, supervisor or by a trained staff member under the immediate supervision of such supervisor, who has been properly trained in its use. After use, the inmate shall be examined by the medical staff, have their eyes cleaned with water and be provided with a change of clothes. An incident report must be submitted to the director of the Bureau of Institutions.
 
 
 13
 The district court found that defendants had used mace in violation of the guidelines set out in the Wisconsin Administrative Code, HSS Sec. 306.08, and that since its use did not comply with the above code, it constituted a violation of the Fourteenth Amendment's due process provisions.
 
 IV.
 
 14
 Turning to the more detailed testimony of the five inmates who testified in this case, we are mindful that under Rule 52 of the Federal Rules of Civil Procedure, we are bound by the findings of fact of the trial court, unless clearly erroneous. This rule, however, does not apply to conclusions of law. Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982), Tankersley v. Albright, 514 F.2d 956, 966 (7th Cir.1975). Rule 52 is particularly applicable where the findings are based primarily upon the credibility of the witnesses, Lee v. National Can Corporation, 699 F.2d 932, 936 (7th Cir.1983), unless the reviewing court, after reviewing the evidence, is left with the definite and firm conviction that a mistake has been committed. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960); Klockner, Inc. v. Federal Wire Mill Corp., 663 F.2d 1370, 1375 (7th Cir.1981). An "appellate court must set aside the trial court's findings if it concludes that they are 'clearly erroneous.' " Kelly v. Southern Pacific Company, 419 U.S. 318, 323, 95 S.Ct. 472, 475, 42 L.Ed.2d 498 (1974).
 
 
 15
 "Evaluations of evidence reached by the accurate application of erroneous legal standards are erroneous evaluations." Protective Committee, etc. v. Anderson, 390 U.S. 414, 445, 88 S.Ct. 1157, 1173, 20 L.Ed.2d 1 (1968).
 
 
 16
 The five inmates, including the two named plaintiffs, testified to instances in which they were maced. Admitted as exhibits in the case were reports filed by the supervisors in some 130 instances in which they had used mace at WCI over a four and a fraction years period. The trial court's findings, upon which it determined to issue its injunction, set out that most of the instances of macing involved situations where inmates were locked in their cells or in the strip cage; that witnesses Mallory, McAdoo, McKinley and Soto were maced under those conditions; that most conduct violations in the AC were for disrespect and disobeying orders; that most of the inmates sent to AC are respectful to officers, do their adjustment time and are returned to the general population; and that the procedures for the use of a chemical agent in the AC do not require that the officer in charge create a show of force by gathering other correctional officers and suiting them up in ERU before the chemical agent was used.[1] The ERU gear consists of a helmet with a flip down face guard, leg guards, a four and one-half foot high plastic shield used to push an inmate in the direction it was desired he move, a jump suit or type of coveralls made of polyester material, gloves and a wooden baton. In addition to the above, the trial court's opinion sets out that chemical agents have been used against inmates who were throwing liquids from their cells, yelling obscenities, refusing to remove a book from the butt of the door, refusing to return a meal tray, refusing to properly submit to a strip search, and refusing to be double-celled, and that some inmates suffered the effects from macing not directed to them.
 
 
 17
 Many of the findings made by the trial court are supported by the evidence. Where the trial court erred was in the conclusions reached from a consideration of only a part of the evidence. Some of the findings leave out facts clearly established by credible, material and uncontradicted evidence. For instance, the trial court's finding that inmates were maced while locked in their cell or in the strip cage, or handcuffed, is supported by evidence. But, such findings do not set forth the reason, necessity or basis for the macing, and the evidence relative to the incident. Where the trial court found that inmates were maced to create and preserve an atmosphere of discipline, to gain compliance with non-emergency orders, to stop yelling obscenities, stop throwing liquids from their cells, refusing to move a book from the butt of the wooden door to a cell, refusing to return a meal tray, and merely refusing to be double-celled, they are clearly erroneous. While McKinley, McAdoo, Mallory and Soto each asserted they were passive, locked in their cells, had not made threats against anyone, did not possess a weapon, had violated no rule at the time they were maced, and that there was no legitimate reason to mace them, the evidence established the contrary. The record and exhibits uncontradictedly establish that when an inmate who is hollering, rattling the bars, yelling obscenities at the staff, throwing objects from his cell at the staff, refused to return a meal tray, blocks the closing of a door, refuses to be double-celled or refuses to comply with direction, he is ordered to come to the front of the cell and put his hands out so that he can be handcuffed, guards can then enter the cell and remove a meal tray or an object used to throw liquid; and where necessary, moved him to another cell with a wooden door which can be closed to prevent his hollering or yelling from disturbing others, or prevent him from throwing liquid or other objects on the officers, or double-celled or whatever is appropriate. If he refuses to come to the front of the cell to be handcuffed after being ordered so to do, and the guard cannot prevail upon him to do so, a supervisor is called. The supervisor then attempts to persuade the inmate to comply with the order. If the inmate refuses, he is then ordered by the supervisor to come to the front of the cell and be handcuffed. If he still refuses, he is told that unless he does do so, he will be maced. If he still refuses, mace is then used. In most every instance, the inmate then complies with the order. He is handcuffed and removed from the cell to permit a guard to enter, and when appropriate the inmate is moved to another cell. Reference in the trial court's opinion to inmates Mallory, McAdoo, McLaughlin and Soto requires specific comment. The evidence shows without challenge that the first four were a serious disciplinary problem. They were involved in many violations of the rules and orders of the institution, and spent much time in the AC. Mallory testified that of the eight years in confinement he had spent approximately six of them in the AC. McAdoo, McLaughlin and Soto each had spent about two years in the AC. Mallory and McAdoo admitted they had been previously found guilty of assaulting a staff officer. Soto admitted he had assaulted numerous prisoners and staff officers while he was in a Pennsylvania prison and that he had been involved in fights with several inmates at WCI. He admitted he struck officer Harkinson and that he tried to kick Dr. Bergen because he thought he was a crackpot. He admitted throwing his dinner tray at an officer on July 15, 1981. He admitted he was a real problem to get along with because he wanted to be himself. He, and the other inmates were described as unpredictable--passive at one moment and aggressive at another. The finding that Mallory was maced for refusing to return his meal tray, that McAdoo was maced for throwing milk on an officer; that McKinley was maced for refusing to remove a book so the wooden door to his cell could be closed, and while he was in the strip cage; and that Soto was maced for refusing to be double-celled is only a part of the evidence. What the finding did not include was the uncontradicted fact that in each instance these four inmates were maced for refusing to obey an order to come to the front of the cell to be handcuffed so that they could be moved to another cell.[2] Mallory testified that he refused to return the meal tray to the guard;[3] that Lt. Prieve was summoned and requested him to return the tray but he refused. After the lieutenant was unable to persuade him to do so, the lieutenant ordered him to come to the front of the cage and be handcuffed so an officer could enter the cell and collect the tray. Mallory refused, and said the only way he would come to the front and be handcuffed was if he was maced. After being maced, he admitted he came to the front of the cell and was handcuffed. The tray was then removed.
 
 
 18
 In the instance of inmate McAdoo, the evidence established numerous inmates had been throwing articles and unknown fluids at the officers, and that mass confusion existed in the AC. Several inmates had been moved to controlled status. Captain Nichols was summoned to the AC. McAdoo testified he was frustrated because his request for a tylenol tablet had not been responded to, and that he decided he would go up on the first two officers who came by his cell. Captain Nichols and Lt. Smith were the victims of milk thrown by McAdoo. Captain Nichols ordered McAdoo to come to the front of the cell so he could be handcuffed. He refused, and was sprayed with mace, after which he came to the front of the cell, was handcuffed, carried to the strip cage and searched. After all containers that could be used to throw a liquid were removed from his cell, his cell was cleaned and he was returned.
 
 
 19
 Inmate McKinley was maced on two separate occasions. The first while in the strip cage for refusing to spread his buttocks for a strip search,[4] after being ordered to do so by the lieutenant. After the macing guards in ERU gear entered the cage and completed the search. On the other occasion inmates had been throwing objects and liquids at officers. Captain McLaughlin was called to the AC. McKinley said he placed a book in between the butt of the door and the door facing, preventing the solid wooden door from being closed. With it closed, the inmate could not throw articles at the officers. Captain McLaughlin ordered McKinley to remove it.[5] After he refused, he was ordered to come to the front of the cell and be handcuffed. When he refused he was told he would be maced if he did not do so. He was maced and immediately came to the front of the cage and was handcuffed. After he was handcuffed at the front of the cell, he threw milk on the captain and officer Beam.
 
 
 20
 Inmate Soto was told he would have to double-cell. He testified he told the officer on several occasions he would not be double-celled, period. When ordered to pack up his things so another inmate could be moved in with him, he testified he said he would not do it. The lieutenant was called and received the same response. He was ordered to come to the front of the cell to be handcuffed but refused. He was maced and immediately came to the front of the cell and was handcuffed.
 
 
 21
 While some of these inmates asserted they had not been ordered to come to the front of the cage and be handcuffed, in every instance, after they were maced, without further order, they came to the front of the cell and were handcuffed.
 
 
 22
 The trial court found that inmates were not given a shower or attention for their eyes after being maced. Such finding overlooks not only the testimony of the staff but also the testimony of the inmates. In all instances but one the inmates were offered or given a shower. In that instance, the unit was on lockdown and the water was cut off because the inmates were throwing it from their cells. In each instance the inmate was furnished clothing, and a nurse rinsed out the eyes of the inmates, except where the inmate refused to have it done. While the findings say the cells were not cleaned, in all instances referred to except one, the cell was cleaned or the inmate removed to another cell. Lastly, the court found the inmate Johnson suffered some slight effects from the macing of other inmates by the mace reaching his cell and that McKinley said he had some ill effects from the macing of others. We need not deal with these issues because under the evidence in this case they do not reach constitutional proportions.
 
 V.
 
 23
 In providing security, the institution must be concerned about the safety of its staff as well as of its inmates. It has the duty to protect the staff from assaults, whether by physical attack upon them, or whether by the throwing of objects or liquids on them. The same kind of duty exists to protect other inmates.
 
 
 24
 The inmates in AC are there for failure to obey the rules and regulations of WCI, such as possession of contraband, fighting, assault on staff officers and so on. Disturbances arise. Inmates become edgy. They get noisy and almost out of control. They are described as unpredictable--passive at one time and aggressive the next moment. On one occasion 26 inmates broke up meal trays and made weapons out of them. Assistant Superintendent Heeringa testified he carried scars on his body from opening a cell door of an inmate who appeared passive, but became violent. Injuries occur to the staff even when they enter the cell in the ERU gear. While the helmet covers part of the face, the helmets can and have been knocked off the head of the guards. Too, the helmet does not cover the full face or protect the front of the neck. One guard dressed in the ERU equipment had his arm cut by a razor blade which the inmate had taped to his hand, requiring more than 90 stitches.
 
 
 25
 When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force. While experts who testified on behalf of the plaintiffs, suggested that rather than seek to enforce orders, it was possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, experience and common sense establish that a prison cannot be operated in such a way.
 
 
 26
 Discipline in a maximum security correctional institution no doubt is difficult, but it is essential if the prison is to function and provide for the care, safety and security of the staff and inmates. Services to provide food, clothing, health, medical, cleaning, laundry and all other services would come to end without discipline. Mob rule would take over. There would not, and could not, be any protection for staff or inmates. Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them. Someone must exercise authority and control. One can quickly reason what would happen in a maximum security prison without proper discipline.
 
 
 27
 The evidence establishes that it is the policy and practice at WCI for officers to enter a cell to enforce compliance with orders. Inmates are and must be required to obey orders. When an inmate refused to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger. One of the plaintiffs' expert witnesses agreed that the institution cannot permit an inmate to violate a rule or disobey an order and that action must be taken to compel compliance with a lawful order.
 
 VI.
 
 28
 Imprisonment carries with it the circumscription or loss of many significant rights and in some cases the complete withdrawal of certain rights, all of which are justified by the considerations underlying our penal system. Hudson v. Palmer, --- U.S. ----, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Prisons are places of confinement of persons who have demonstrated their inability to control and conform their behavior to the legitimate standards of society. Most of those sent to the AC have demonstrated their lack of respect for the rules and regulations of the institution and their disregard of the rights of others. A reflection upon the facts demonstrate the severe and grave problem confronting prison officials. As pointed out in Hudson v. Palmer, supra, during 1981 and the first half of 1982, in state and federal prisons, there were over 29 riots or similar disturbances, a number of prison personnel were murdered by prisoners, and over 120 prisoners were murdered by fellow inmates. In the federal system during 1983, there were 11 inmate homicides, 359 inmate assaults on other inmates, and 227 inmate assaults on prison staff. There were in the same system in 1981 and 1982, over 750 inmate assaults on other inmates and over 520 inmate assaults on prison personnel. With such statistics, we must "strike the balance in favor of institutional security" which is "central to all other correctional goals." Hudson v. Palmer, supra. Knowledge of the above facts make it clear that within the institutions "prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but visitors." Hudson v. Palmer, supra. See also Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).
 
 
 29
 The district court's assertion that we have recognized the trend towards restricting the use of chemical agents misinterprets what we have said, and the decisions of other courts.
 
 
 30
 In Stringer v. Rowe, 616 F.2d 993, 998 (7th Cir.1980), we said:
 
 
 31
 In order to establish a violation of the Eighth Amendment, a plaintiff must show that prison officials intentionally inflicted excessive or grossly severe punishment on him or that the officials knowingly maintained conditions so harsh as to shock the general conscience. United States ex rel. Miller v. Twomey, 479 F.2d 701, 719-20 (7th Cir.1973), cert. denied, Gutierrez v. Dept. of Public Safety, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974). Courts have sanctioned the use of tear gas "when reasonably necessary ... to subdue recalcitrant prisoners." Clemmons v. Greggs, 509 F.2d 1338, 1340 (5th Cir.1975).[6]
 
 
 32
 Later in Lock v. Jenkins, 641 F.2d 488, 496 (7th Cir.1981), we quoted with approval from Johnson v. Glick, 481 F.2d 1028 (2d Cir.), cert. denied sub non, Employee-Officer Jones v. Johnson, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) this language:
 
 
 33
 In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. 481 F.2d at 1033.
 
 
 34
 Courts should proceed cautiously in making an Eighth Amendment judgment for unless the Supreme Court reverses it, "a decision that a given punishment is impermissive under the Eighth Amendment cannot be reversed short of a constitutional amendment," so that revisions cannot be made in the light of further experience. Rhodes v. Chapman, 452 U.S. 337, 351, 101 S.Ct. 2392, 2401, 69 L.Ed.2d 59 (1981); see also Gregg v. Georgia, 428 U.S. 153, at 176, 96 S.Ct. 2909, at 2926, 49 L.Ed.2d 859. In considering whether the Eighth Amendment has been violated, it must be remembered that such inquiries "spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." Rhodes v. Chapman, supra, 452 U.S. at 351, 101 S.Ct. at 2401; Bell v. Wolfish, 441 U.S. at 539, 99 S.Ct. at 1874. The Supreme Court in Procunier v. Martinez, 416 U.S. 396, 404-405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) and in Rhodes v. Chapman, supra, 452 U.S. at 351, n. 16, 101 S.Ct. at 2401, n. 16, pointed out some of the problems of prisoners and reasons why federal courts adopted a broad hands-off attitude towards problems of prison administration, and the limitations on the scope of federal review of conditions in state penal institutions. It said in Procunier v. Martinez, supra:
 
 
 35
 Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication.
 
 Rhodes v. Chapman, supra, n. 16, says:
 
 36
 We have sketched before the magnitude of the problems of prison administration. Procunier v. Martinez, 416 U.S. 396, 404-405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). See generally National Institute of Justice, American Prisons and Jails (1980) (5 Vols.). It suffices here to repeat:
 
 
 37
 "[T]he problems of prisons in America are complex and intractable, and more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism." Procunier v. Martinez, supra, at 404-405, 94 S.Ct., at 1807 (footnote omitted). See also Wolff v. McDonnell, 418 U.S. 539, 561-562, 568, 94 S.Ct. 2963, 2977, 2980, 41 L.Ed.2d 935 (1974); Jones v. North Carolina Prisoners' Labor Union, supra [433 U.S. 119] at 125, 97 S.Ct. [2532] at 2537 [53 L.Ed.2d 629 (1977) ].
 
 
 38
 Since our decision in Martinez, the problems of prison population and administration have been exacerbated by the increase of serious crime and the effect of inflation on the resources of states and communities. This case is illustrative. Ohio designed and built SOCF in the early 1970's, and even at the time of trial it was found to be a modern "top-flight, first-class facility." Supra, [101 S.Ct.] at 2395. Yet, an unanticipated increase in the state's prison population compelled the double celling that is at issue. 452 U.S. at 351, 101 S.Ct. at 2401, n. 16.
 
 
 39
 Central to all other correctional goals is the institutional consideration of internal security within the correctional facilities themselves, and "preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." Bell v. Wolfish, supra, 441 U.S. at 546, 99 S.Ct. at 1878. If prison officials are to be free to take appropriate action to ensure the safety of inmates and correctional personnel, they must be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline to maintain institutional security. Such considerations are peculiarly within the province and professional expertise of correctional officers, and without substantial evidence to indicate such officials have exaggerated their response to these considerations, courts should defer to their judgment. Not only are such administrators in a better position to know and determine what action or remedies are needed and proper, but the operation of our correctional systems and facilities is within the responsibility of the Executive and Legislative branches of government. Bell v. Wolfish, 441 U.S. at 547-548, 99 S.Ct. at 1878-1879; Procunier v. Martinez, 416 U.S. at 405, 94 S.Ct. at 1807. See also, Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); Hewitt v. Helms, infra. The Supreme Court has "repeatedly said both that prison officials have broad administrative and discretionary authority over the institution they manage, and that lawfully incarcerated persons retain only a narrow range of protected liberty interests." Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983).
 
 
 40
 The Eighth Amendment prohibits the infliction of cruel and unusual punishment; that is, the infliction of excessive or grossly severe punishment disproportionate to the severity of the offense, or the unnecessary and wanton infliction of pain or infliction of pain without justification. Eighth Amendment judgments "should neither be nor appear to be entirely the subjective views of judges," but such "judgments should be informed by objective factors to the maximum possible extent." Rhodes v. Chapman, 452 U.S., at 346, 101 S.Ct. at 2399. Hence, "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional," and to "the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Id.
 
 
 41
 The Supreme Court has never held, nor have we or any other court of appeals, so far as we can determine, that the use of tear gas or a chemical agent is a per se violation of the Eighth Amendment, whether an inmate is locked in his cell or not. What we, and other courts have held, is that the appropriateness of the use must be determined by the facts and circumstances of the case. We have held, and now restate that it is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain. Thus, we adhere to what we said in Stringer v. Rowe, 616 F.2d at 998, set out above. The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment. Lock v. Jenkins, supra; Poindexter v. Woodson, 510 F.2d 464, 466 (10th Cir.), cert. denied, 423 U.S. 846, 96 S.Ct. 85, 46 L.Ed.2d 68 (1975); Clemmons v. Greggs, 509 F.2d 1338, 1340 (5th Cir.), cert. denied, 423 U.S. 946, 96 S.Ct. 360, 46 L.Ed.2d 280 (1975); Landman v. Peyton, 370 F.2d 135 (4th Cir.1966); Bailey v. Turner, 736 F.2d 963 (4th Cir.1984); Donahue v. Maynard, 437 F.Supp. 47 (D.Kan.1977), and this is so whether the inmate is locked in his prison cell or is in handcuffs, Bailey v. Turner, supra; McCargo v. Mister, 462 F.Supp. 813 (D.Md.1978); Greear v. Loving, 391 F.Supp. 1269 (W.D.Va.1975). The "use of the substance (tear gas) in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required." Spain v. Procunier, 600 F.2d 189, 195 (9th Cir.1979). Continuing in Spain, the court said:
 
 
 42
 The infliction of pain and the danger of serious bodily harm may be necessary if there is a threat of an equal or greater harm to others, as is reflected in the doctrine of self defense which permits one to do harm to another person who threatens unlawfully to do an equal or greater harm to another.
 
 
 43
 The responsible institutional personnel on the spot are in a better position to determine when its use is necessary than the courts. Clearly, the use of a chemical agent in dangerous quantities is justified only in narrowly defined circumstances but the use of nondangerous quantities of the substance in order to prevent a perceived future danger does not violate "evolving standards of decency" or constitute an "unnecessary and wanton infliction of pain." We think its use can be justified in situations which are reasonably likely to result in injury to persons or a substantial amount of valuable property. 600 F.2d at 196. Prison officials' responsibility extends to the protection of the guard, as well as to the inmates. The "safety of the institution's guards and inmates is perhaps the most fundamental responsibility of the prison administration." Hewitt v. Helms, 103 S.Ct. at 872. We should therefore be extremely cautious before attempting to prohibit or limit the necessary means by which they may carry out this responsibility.
 
 
 44
 The record in this case fails to disclose that prison officials unjustifiably used excessive force against plaintiffs, or other inmates or that they failed to act in good faith and with a reasonable belief of the lawfulness of their actions under the circumstances.[7] The actions were therefore not a violation of the Constitution, and since not a violation of the Constitution, "it does not in itself subject an inmate's treatment by prison authorities to judicial oversight." Montayne v. Haymes, 427 U.S. 236 at 242, 96 S.Ct. 2543 at 2547, 49 L.Ed.2d 466 (1976); Hewitt v. Helms, 103 S.Ct. 869. The inmates' argument is that the use of the chemical agent is greater force than is necessary to satisfy the institution's legitimate interest in maintaining security. However, in the instances shown in the record the chemical agent was used for failure of the inmate to obey a direct order and the use of mace was a reasonable response to the institution's legitimate security concern. The use of mace is not a per se violation of the Eighth Amendment. Appellees have not met their burden of showing that the defendants intentionally used exaggerated or excessive means to maintain discipline and provide the needed security for the institution. Nor have they shown it was used to inflict excessive or grossly severe punishment on them. It is not a question here of whether the district court's plan or the institution's plan for maintaining order and discipline is best, "but in what branch of the government is lodged the authority to initially devise the plan," Bell v. Wolfish, 441 U.S. at 562, 99 S.Ct. at 1886. The evidence does not establish that the actions and conduct of the institution or its personnel, or the regulations of the institution or their application violate the Eighth or Fourteenth Amendments, or that a chemical agent has been unjustly or improperly used.
 
 
 45
 The decision of the district court is therefore reversed and these cases remanded with direction to dissolve the injunctions issued and to dismiss the complaints with direction that defendants recover their costs.
 
 
 46
 REVERSED AND REMANDED.
 
 
 
 *
 The Honorable Richard B. Kellam, Senior District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 The record establishes that on the occasion of each of the macings referred to, there were numerous officers present
 
 
 [2]
 Plaintiffs' expert, Dr. Kirkham, testified it was appropriate for the guards to handcuff the inmate before attempting to enter the cell
 
 
 [3]
 The plaintiffs' expert witness, Dr. Kirkham, testified a meal tray can be used as a weapon; that an inmate who had refused to return a tray should not be permitted to keep it. In fact, he replied "absolutely not," and that the rule on return of trays must be enforced
 
 
 [4]
 In Bell v. Wolfish, 441 U.S. 520 at 558, 99 S.Ct. 1861 at 1884, 60 L.Ed.2d 447 (1979), the court held that a requirement that all inmates expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution was not unreasonable and may be conducted on less than probable cause
 
 
 [5]
 An officer could probably have removed it, but he would have exposed himself to having liquids thrown on him
 
 
 [6]
 This case was before us on the issue of whether a motion for summary judgment on behalf of defendants was justified. Finding a disputed issue of a material fact, it was remanded for further proceedings
 
 
 [7]
 The trial court found the action of the guards in macing Soto was in good faith