Thomas BLAIR–EL, Plaintiff,

v.

Max TINSMAN and Jerry
Frieman, Defendants.

Cause No. 81–3032.

United States District Court,
S.D. Illinois.

July 31, 1987.

Kenwyn A. Redding, East St. Louis, Ill.,
for plaintiff.

Randy E. Blue, Asst. Atty. Gen., Springfield, Ill., for defendants.

## MEMORANDUM AND ORDER

STIEHL, District Judge:

This cause was heard by the Court sitting without a jury. Pursuant to Fed.R. Civ.P. 52(a), the Court makes the following findings of fact and conclusions of law:

### INTRODUCTION

The plaintiff, Thomas Blair-El, was an inmate at Menard Correctional Center, and at all times in question was confined to the segregation unit. This unit is limited to inmates who have committed major infractions of the rules and regulations of the correctional center, and is comprised of long galleries of 44 single-inmate cells in two tiers. The plaintiff was housed at the end of 6 gallery in cell 44, the cell farthest from the guard station. Located in the cell next to the plaintiff was Johnny Brown, who was known to suffer from asthma. The tier of cells above 6 gallery is known as 8 gallery.

Plaintiff alleges that his Eighth Amendment right to be free from cruel and unusual punishment was violated when he was sprayed with C/S gas late on the morning of December 5, 1975 by defendants Max Tinsman and Jerry Frieman, correctional officers at Menard. Plaintiff asserts that around 9:00 A.M. on December 5, Brown suffered an asthma attack, and that Brown then asked him to call the guard at the end of the gallery to bring Brown's asthma medicine. Blair-El alleges that in response to his calling for medical attention for Brown, defendants arrived at his cell with a canister of C/S gas. Plaintiff in his complaint alleges that he was sprayed without warning by defendants, resulting in painful burns on his body, rendering him unconscious and causing him to be taken from his cell and treated at the hospital.

### FINDINGS OF FACT

The Court finds that the following events occurred:

Upon arriving at the facility on the morning of December 5, 1975, Lt. Dennis Hartman was notified that a disturbance in segregation had started the evening before.

By the time he arrived, the level of chanting from the segregation unit was extremely loud and could be heard throughout the entire institution. As time continued, the chanting did not die down as more inmates took up the chanting. Hartman and other officials of the institution were concerned that chanting throughout the institution could result in disorder and ultimately in fighting between gangs in the general population.

The correctional officers determined that the chanting on the morning of December 5th was being generated from 6 gallery. Lt. Hartman went to the area of 6 gallery to check the nature of the disturbance. Hartman did so as a member of the tactical staff, in an attempt to resolve the problem. When he was half-way down the gallery he realized that 8 gallery was also involved. Hartman went up to 8 gallery to check the disturbance. He approached the cell of Alfred Morgan-Bey, talked with him, told him to quiet down, and then walked down 8 gallery.

Hartman then went to the Assistant Warden's office and advised him of the occurrences. The Assistant Warden advised Hartman to go to the armory and draw chemical agents. Hartman was trained in the use of chemical agents and weapons. Hartman left the canisters containing chemical agents at the front gallery, out of the inmates' line of vision. By this time, at least 15–20 inmates in 6 and 8 galleries were involved in the chanting. Hartman returned to 8 gallery, and warned Morgan-Bey to stop the chanting or chemical agents would be used against him. (Approximately thirty minutes had elapsed by this point.) The chanting in both galleries grew in volume and numbers, and in response, Hartman returned to Morgan-Bey's cell carrying the chemical agent. Hartman could hear Blair-El's voice from 6 gallery while he was standing before Morgan-Bey's cell. He heard plaintiff repeatedly yelling "Blackstone," the name of a prison gang.

When Hartman retrieved the canisters from the front of the gallery, he sent defendants Tinsman and Frieman to 6 gallery to stop the disturbance there. Lt. Tinsman started questioning the inmates as to the nature of the problem, and soon realized that plaintiff wanted to act as the spokesman. Tinsman talked with Blair-El about the problem until he "lost contact with him." Plaintiff then started hollering for other inmates on both 6 and 8 gallery. Blair-El was yelling that officers were on the gallery with gas. Tinsman warned plaintiff that they were going to spray him if he did not stop the disturbance. Immediately thereafter, plaintiff threatened to get Tinsman "and his people." Frieman was present throughout the conversation, and corroborated that Blair-El had threatened Tinsman's family. Tinsman made it clear to plaintiff what would happen to him if he did not stop the chanting and yelling. Tinsman made several attempts to quiet Blair-El, and in response to his refusal to stop his chanting, Tinsman instructed Frieman to administer the gas to Blair-El.

Plaintiff was the only member of 6 gallery to be sprayed. The spraying Blair-El received only lasted a few seconds. The C/S gas canister empties its contents in 9 seconds and the canister was not emptied when Blair-El was sprayed. Frieman was wearing a gas mask, through which he could talk, during the incident. Tinsman stood next to Frieman directly in front of the cell, but was not masked. At the time of the incident, Tinsman had had more than 20 years service as a correctional officer, and Blair-El was the first inmate he ever found it necessary to spray.

Immediately after the gas was sprayed, Frieman assisted Tinsman in ventilating the gallery by opening the window located directly across from plaintiff's cell and turning on the 38" blade fan in the gallery. Six more windows in the area of the gassing were also opened. Plaintiff was then offered medical treatment by Tinsman, but refused the treatment. Other inmates needing treatment were taken to the hospital immediately after the gassing. Tinsman authorized Blair-El to be taken from his cell and showered.

In contrast to the foregoing findings, the plaintiff testified that he was not creating

a disturbance, nor chanting any gang slogans on the morning of December 5th. Rather, he was attempting to get the guard at the end of the gallery to come to Johnny Brown's cell with his asthma medicine because Brown was suffering from an asthmatic attack. (The evidence established that at that time the guards did not patrol the gallery, and the inmates had to use a relay-system to pass messages up to the guard station.)

Plaintiff stated that as a result of the spraying he suffered burns on his face, his hair fell out, he had chest congestion, nose bleeding, and back pains resulting from being rendered unconscious by the gas, falling and hurting his back. However, on direct examination and cross-examination, plaintiff testified that he did not inform the defendants, Frieman or Tinsman, as to his problems after being sprayed, nor that he desired medical attention. Blair-El also testified that he was sprayed with mace four days later on December 9, 1975. He refused medical attention after that spraying also, and merely rinsed out his eyes in his cell.

On cross-examination, Blair-El acknowledged that he could not remember what he was yelling; could not remember if he was shaking the bars; and did not know how many other inmates were also yelling, but did acknowledge that he could hear voices on 8 gallery.

The Court finds that the plaintiff's version of the events leading to the spraying was not supported by the evidence. While a considerable number of years have passed since the incident, neither the plaintiff nor his witnesses presented a cohesive, credible accounting of the events of December 5, 1975. The evidence indicated that Johnny Brown may have requested help in obtaining his asthma medicine, but that was not the sole basis for Blair-El's chanting on December 5th. Plaintiff was not merely calling to the guards for medical attention, but was loudly and constantly chanting his gang's name.

Moreover, the Court finds that plaintiff was issued a disciplinary ticket on December 5, 1975 for his chanting, and that it was the finding of the committee that his activity was part of an "organized attempt to disrupt the routine of the Segregation Unit." Defendant's Exhibit # 2 indicated that Blair-El pleaded guilty to the charge, but he claimed that he was saying his prayers. This is certainly in conflict with his testimony at trial that he was calling for medical attention.

The Court finds that there were no fires started on either 6 or 8 galleries. Nor were there any projectiles thrown from the cells, nor did any inmates attempt to grab or harm any correctional officer, nor was there fighting among inmates in the segregation unit.

The Court also finds that there was not a chaplain present before or after the spraying. Nor was there a physician or medical technician present on the galleries prior to the spraying.

The Court further finds that defendants Tinsman and Frieman had been sufficiently trained in the use of C/S gas, and that the canister they used had been checked for usability by Lt. Hartman prior to its use on plaintiff.

## CONCLUSIONS OF LAW

It has long been recognized that incarceration results in the loss of significant rights. The Seventh Circuit states "[i]mprisonment carries with it the circumscription or loss of many significant rights and in some cases the complete withdrawal of certain rights...." *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir.1984), *cert. denied* 470 U.S. 1005, 105 S.Ct. 1846, 85 L.Ed.2d 144 (1985), *citing Hudson v. Palmer*, 468 U.S. 517, 524, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Prisons house those members of society who have "demonstrated their inability to control and conform their behavior to the legitimate standards of society." *Soto, Id.* Frequently within the prison itself, inmates are involved in disturbances within the institution which can escalate to riots, physical injury and even murder. The Supreme Court has recognized a need to "strike the balance in favor of institutional security." A need that is "central to all other correctional goals."

*Hudson,* 468 U.S. at 527, 104 S.Ct. at 3200 *quoting Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). To effectuate this goal the Supreme Court has given wide deference to actions taken by prison officials to ensure institutional security. "[P]rison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but visitors." *Soto,* at 1268, *quoting Hudson,* 468 U.S. at 526, 104 S.Ct. at 3200. Further, there is also an "obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Hudson,* at 527, 104 S.Ct. at 3200.

The Supreme Court has directed courts to proceed with caution when finding an Eighth Amendment violation. Unless the finding is reversed by the Supreme Court, "a decision that a given punishment is impermissible under the Eighth Amendment cannot be reversed short of a constitutional amendment." *Rhodes v. Chapman,* 452 U.S. 337, 351, 101 S.Ct. 2392, 2401, 69 L.Ed.2d 59 (1981) (quoted in *Soto,* 744 F.2d at 1268). The Eighth Amendment states "[e]xcessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted.*" U.S. Const. amend. VIII (emphasis added). It is the last element of the Eighth Amendment on which the plaintiff bases his claim.

Plaintiff asserts that the actions of the defendants in spraying him with C/S gas constituted cruel and unusual punishment and that this punishment was inflicted maliciously and sadistically for the purpose of causing harm to him. The Seventh Circuit has held that: "The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners *does not constitute cruel and inhuman punishment.*" *Soto,* 744 F.2d at 1270 (emphasis added) (citations omitted). Moreover, this is the standard in the Seventh Circuit "whether an inmate is locked in his prison cell or is in handcuffs." *Id.*

Therefore, the plaintiff may succeed on his Eighth Amendment claim only if the actions of the correctional officers were not "reasonably necessary" under the circumstances of this case. The Seventh Circuit has also recognized that "responsible institutional personnel on the spot are in a better position to determine when its [chemical agent] use is necessary than the courts." *Id.* The "most fundamental responsibility" of prison authorities is to ensure the safety of guards and inmates. *Id.* "We should therefore be extremely cautious before attempting to prohibit or limit the necessary means by which they may carry out this responsibility." *Id.*

The Supreme Court, in *Whitley v. Albers,* held that:

> Where a prison security measure is undertaken to resolve a disturbance ... that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on *"whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."*

475 U.S. 312, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (emphasis added) *quoting Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) *cert. denied sub nom.* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

Accordingly, this Court concludes that the defendant correctional officers acted reasonably when they sprayed plaintiff with C/S gas. The disturbance throughout the institution was, in large part, created by the shouting and chanting of plaintiff. Just prior to the time the plaintiff was sprayed, the shouting had escalated to the point that several inmates in segregation had joined with Blair-El and the disturbance threatened to spill out into the general population. The situation had, at that point, reached a volatile and dangerous level.

Numerous verbal warnings were given to plaintiff by the defendants before they resorted to use of the chemical agent. Their actions were not hastily done, but rather were a reasonable response to the immediacy of the problem. The defendants

had no way of telling whether the disturbance would continue to grow if they continued to negotiate, or sent others in to negotiate, but they had ample reason to believe that these options presented unacceptable risks. In quelling a potentially volatile disturbance, time is of the essence. Clearly, in the events of this case, time was critical. The officials had little time to negotiate—the disturbance had to be ended. Under these circumstances, the spraying of plaintiff with C/S gas was reasonably necessary, and part and parcel of a good faith effort to restore prison security. As such, it did not violate plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. *Soto*, 744 F.2d 1260; *Whitley*, 106 S.Ct. 1078.

While the plaintiff has not alleged a loss of liberty interest claim, the Court, nevertheless, believes it should be addressed. It has long been recognized that certain rules and regulations, when violated, result in a deprivation of an inmate's liberty or property interest. However, this is limited to regulations that use mandatory language. "When a regulation or rule with binding force establishes substantive criteria, it also creates constitutional 'liberty' or 'property.'" *Miller v. Henman*, 804 F.2d 421, 424 (7th Cir.1986) *citing Wolff v. McDonnell*, 418 U.S. 539, 571–72 & n. 19, 94 S.Ct. 2963, 2982 n. 19, 41 L.Ed.2d 935 (1974); *Hewitt v. Helms*, 459 U.S. 460, 471–72, 103 S.Ct. 864, 871–72, 74 L.Ed.2d 675 (1983); *Olim v. Wakinekona*, 461 U.S. 238, 244–46, 103 S.Ct. 1741, 1745–46, 75 L.Ed.2d 813 (1983). Further, "only statutes and binding regulations establish liberty interests in favor of prisoners." 804 F.2d at 425. (Citation omitted).

Illinois Department of Corrections Administrative Regulation 404, regulates the use of concentrated tear gas, tear gas and stun guns. Reg. 404 states, in part:

**I. POLICY OF DEPARTMENT:** To authorize the use of tear gas, concentrated forms of tear gas and/or stun guns only in accordance with the crisis procedural manual and upon the approval of the institution's Chief Administrative Officer. *Unless the situation requires immediate action*, the medical staff *should*

*also be contacted* prior to the use of chemicals or the stun gun.

**II. EXPLANATION:**

. . . .

B. *Whenever possible*, a chaplain and physician or a medical technician *are to be present* when such chemicals are used to forcefully move or subdue a resident by any means.

C. The resident or residents upon whom a chemical or stun gun was used *should be examined* by a physician immediately and observed by a medical staff member for a period determined by the staff physician. . . .

(Emphasis added.)

Each of these sections of Regulation 404 uses mandatory language in directing that certain procedures are to be followed when chemical agents are used. However, both Sections I and II are qualified in their applications. Section I recognizes that the requirement of contacting the medical staff attaches *"unless the situation requires immediate action."* The defendants here were faced with the precise situation which the regulation intended to exclude. The disturbance in segregation, on the morning of December 5th, rapidly accelerated to such a level that the corrections staff could not take the risk of a time delay in calling in any additional personnel. What had been a disturbance limited to a few residents in one unit, within a few minutes spread throughout the unit and threatened to incite the general population. The catalyst of the disturbance was centered in two cells in segregation, Blair-El's and Morgan-Bey's, and immediate action was required to quell a possibly dangerous situation. It was not reasonably possible, under these circumstances, to require the presence of a chaplain and medical personnel when the situation required that a decision be made quickly to control a rapidly accelerating disturbance. *Accord, Pardo v. Hosier*, 611 F.Supp. 693, 697–98 (C.D.Ill.1985).

Furthermore, the Court has found that plaintiff was offered and refused medical attention. Although plaintiff testified that

he was denied medical attention, this is contrary to the allegations of his complaint, as well as the preponderance of the evidence. Plaintiff specifically alleges, in "Facts of the Case" that:

> On the morning of December 5th, 1975, the Plaintiffs herein were attacked by and sprayed with chemical substance known as CS Gas causeing [sic] great physical pain and distress to Plaintiffs requireing [sic] that they be taken from thier [sic] cells *and given medical attention.*

(Emphasis Added.)

The Court is well aware that the only complaint before it was drafted by another inmate. However, the plaintiff had notice from this Court that his pleadings were insufficient to raise a claim for denial of medical treatment. In its Order of February 20, 1987, this Court stated:

> Although plaintiff now argues that these defendants did not provide any medical treatment for him until forty-eight hours after he was sprayed, *nowhere in his complaint does plaintiff allege that he was denied adequate medical care....* 'In order to state a cognizable claim [under the eighth amendment], a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.' *Estelle v. Gamble*, 429 U.S. 97, 106 [97 S.Ct. 285, 292, 50 L.Ed.2d 251] (1976). *Plaintiff has failed to do so.*

(Emphasis Added.) Plaintiff's failure to allege denial of medical attention, coupled with his testimony that *he refused* medical attention is fatal to any liberty interest claim he may have based on Reg. 404 II(C). The defendants Tinsman and Frieman acted reasonably under the exigency of the circumstances. Although certain mandatory language is contained in the regulation, the requirements therein are not to be imposed inflexibly. This Court finds that plaintiff has failed to establish any violation of a liberty interest under the provisions of Reg. 404.

Accordingly, the Court finds in FAVOR of defendants and AGAINST plaintiff.

The Clerk of the Court is instructed to enter judgment accordingly.

IT IS SO ORDERED.