Robert L. COLLINS, Plaintiff,

v.

Randall KAHELSKI, et al., Defendants.

No. 88–C–643.

United States District Court,
E.D. Wisconsin.

Aug. 3, 1993.

Robert L. Collins, pro se.

Daniel S. Farwell, Asst. Atty. Gen., State of Wis., Dept. of Justice, Madison, WI, for defendants.

## DECISION AND ORDER

RANDA, District Judge.

This case comes before the Court on cross-motions for summary judgment. The plaintiff, Robert L. Collins ("Collins"), a federal prisoner formerly incarcerated at Wisconsin's Waupun Correctional Institution ("WCI"), filed suit for violation of his rights under the Eighth Amendment of the United States Constitution. The suit arises out of a beating he received from other inmates during a prison disturbance at WCI, in which Collins was involved. The claims, all brought pursuant to 42 U.S.C. § 1983, allege as follows: (1) The defendants' failure to protect Collins from assault by other prisoners; (2) the defendants' decision to use tear gas to quell the disturbance; and (3) the inadequate medical treatment Collins received after the disturbance. For the following reasons the Court grants summary judgment for the defendants, Randall Kahelski, Warren Young and other Unknown Prison Officials (collectively, "the Defendants"), on all claims.[1]

## FACTUAL BACKGROUND

On February 4, 1985, Collins, at the time an inmate at WCI, participated in a group therapy session conducted by Dr. Robert C. Kuhn in the recreation area of WCI's adjustment center. (Plaintiff's Proposed Findings of Fact at ¶ 43; Defendant's Proposed Findings of Fact at ¶ 6.) The group was meditating to some background music supplied by a tape playing in a nearby cassette radio, when one of the inmates (Inmate Tucker) walked over to the radio and changed the tape to a radio station playing music. (Knick Aff. at Ex. U, p. 2; Knick Aff. at Ex. 1, p. 1–2; Knick Aff. at Ex. T, p. 2.) Dr. Kuhn told Inmate Tucker that he would have to terminate the session if the music kept playing, but Tucker refused to allow Dr. Kuhn to turn the music off. (Knick Aff. at Ex. 1, p. 1–2; Knick Aff. at Ex. U, p. 2.) At that point, Dr. Kuhn sensed from the facial expression of at least one of the inmates (Inmate Holman) that there was going to be trouble, so he got up and walked towards the exit. (Knick Aff. at Ex. S, p. 1–2; Knick Aff. at Ex. U, p. 2.)

The exit consists of a cell-bar inner door (door # 30) and at least one, maybe two, outer door(s) with windows (door # 29), and a sally port in between. (Krueger Aff. at ¶ 5; Defendants' Proposed Findings of Fact at ¶ 13; Plaintiff's Proposed Findings of Fact at ¶¶ 45–47.) The inner and outer doors are electronically controlled and linked in such a

1. Collins initially sued Warren Young, WCI's warden at the time of the disturbance, Randall Kahelski, a prison official involved in the disturbance, and other "unknown prison officials" allegedly involved in the incident. (Complaint at 2–3.) Kahelski was served by mail on July 15, 1988, but the process intended for Young was returned unexecuted on June 30, 1988, as Young was deceased. (Process Receipt and Return for Randall Kahelski dated 6/28/88; Process Receipt and Return for Warren Young dated 6/28/88.) Service was then made by mail generally upon the Warden of Waupun Correctional Institution, which was acknowledged on July 20, 1988, but this method of service was obviously insufficient for purposes of obtaining jurisdiction over Young or his estate. (Process Receipt and Return for Warden of Waupun Correctional Institution dated 7/15/88.) Collins never moved to substitute Young's estate as a defendant.

Collins also renews a previous motion for appointment of counsel, moves to amend his complaint to substitute the names of seventeen (17) additional defendants for the previously designated "unknown prison officials", and moves to substitute the Estate of Randall Kahelski as a defendant in place of Kahelski himself, who died while the matter was pending. Because the Court holds for the Defendants on the summary judgment motion, it is unnecessary to address these additional motions.

manner that if one of the doors is open, the other(s) are locked shut and cannot be opened, although Collins claims that the doors can be opened manually in an emergency. (Defendants' Proposed Findings of Fact at ¶ 13; Polinske Aff. at ¶ 2; Plaintiff's Reply Brief at 2(d).)

At this point there is some dispute in the record. The Defendants' and prison officers' story is as follows: When prison officials first arrived, Dr. Kuhn and two inmates (Inmates Robinson and Balmaras) were standing in the sally port area, with the inner door open, requesting to be let out. (Krueger Aff. at ¶ 5; Polinske Aff. at ¶ 4; Kempfer Aff. at ¶ 5.) The two inmates were told to close the inner door, which they did, and then were handcuffed and allowed to exit, along with Dr. Kuhn. (Id.) The rest of the inmates were then ordered to come to the door to be handcuffed. None did. (Krueger Aff. at ¶ 6; Polinske Aff. at ¶ 5.) The inner door was then left unlocked to permit inmates to exit. None left. (Polinske Aff. at ¶¶ 5–6.) Rather than leave, several inmates seized the door and tied it open with scarves, making it impossible for prison guards to open the outer door. (Polinske Aff. at ¶ 6; Knick Aff. at Ex. T, p. 2; Knick Aff. at Ex. U, p. 3.) Collins was not with Dr. Kuhn or Inmates Robinson and Balmaras at the time they requested permission to exit, nor did the prison guards hear any request from Collins to be released, either at the time of Dr. Kuhn's departure or afterward when the inmates were instructed to come forward to be handcuffed. (Krueger Aff. at ¶¶ 5–6; Polinske Aff. at ¶¶ 4–5; Kempfer Aff. at ¶ 6.)

At that point, prison officials were hampered further because they could not see what was happening inside the room. The inmates had broken the surveillance cameras and had draped a coat over the window of the outer door. (Polinske Aff. at ¶ 7; Kempfer Aff. at ¶ 8; Knick Aff. at Exs. F, J & M.) The situation was also very dangerous. Some of the inmates were using pieces of the broken cameras in an attempt to batter down the doors. (Knick Aff. at Ex. G.) Others were verbally threatening the guards, including an incident where Inmate Collins, who had obviously been beaten, was shown to Officer Kahelski through the outer door window, with Inmate Irving stating, "See this Kahelski—this is a snitch—this is what's going to happen to your people so bring them on." (Id.) In this "hubbub" of many sounds and voices, some officers said they did not hear any specific cries for help from Collins and could not see him being beaten (Krueger Aff. at ¶ 7; Kempfer Aff. at ¶ 10), although one officer states that he "was aware" that an inmate "was crying for help and asking to be let out". (Borgen Aff. at ¶ 5.) In any event, the guards could not safely assist Collins because the inner door was tied open and the situation too dangerous. (Borgen Aff. at ¶¶ 5–7.)

The guards then used chemical agents to quell the disturbance, which prompted the inmates to untie the inner door and allow the guards to enter and remove the inmates to control cells. (Borgen Aff. at ¶¶ 6–8; Polinske Aff. at ¶¶ 8–9.) All of the inmates, including Collins, were first allowed to shower and given clean clothes, and a nurse washed out their eyes. (Defendants' Proposed Findings of Fact at ¶ 20; Plaintiff's Proposed Findings of Fact at ¶ 62.) Collins' injuries were examined by the prison nurse, and then he was taken by state car to the emergency room at Waupun Memorial Hospital, where further examination and x-rays (including x-rays of his "facial bones") failed to show any bone fractures. (Wood Aff. at Ex. H; Janssen Aff. at ¶¶ 6–7, Ex. AA.) Collins was returned to prison that night, where he spent the next 2–3 days in the health services unit before being released and returned to the adjustment center. (Janssen Aff. at ¶ 8.)

Collins' version of events is different, the degree of difference depending on when he is telling the story. Collins gave a statement to Dodge County Sheriff's Detective Ken Peters the day after the incident took place. (Knick Aff. at Ex. T; Knick Aff. at Ex. U, p. 3–4.) At that time, Collins stated that he observed Dr. Kuhn walk to the door and leave with two other inmates. (Knick Aff. at Ex. T, p. 2.) He stated that he then began to move toward the same door but it locked in front of him. (Id.) He then asked a prison guard to let him out, and the guard said he would.

(Id.) Before that could happen, 3–4 inmates seized the inner door and tied it open with scarves. (Id.) Then the inmates beat Collins with kicks, punches and metal blows using pieces of the broken cameras. (Id. at 2–3.) After the beating, the inmates lifted Collins up and dragged him to the sally port, where they showed his face to the guards through the window as an example of what would happen if they tried to enter the room. (Id. at 3–4.) Collins was then pushed back into the recreation area until the guards used tear gas to quell the disturbance. (Id. at 4.) No complaint was made that prison officials deliberately ignored his cries for help or deliberately refused to let him exit the room.[2] No complaint was made concerning the use of tear gas by prison officials. And, until shortly after this lawsuit was filed, nothing in the medical records indicated that Collins ever complained of continuing injuries from the beating or of the treatment he received after the beating.

This story changed three years later, when Collins filed this lawsuit, and again seven years later, when Collins filed his motion for summary judgment. As to the disturbance, Collins now claims he was with Dr. Kuhn and the other two inmates in the sally port area between the inner and outer doors when the same asked to leave. (Collins' Second Declaration (12/14/92) at ¶ 5.) He claims one of the staff members responsible for controlling the doors specifically ordered him to step out of the sally port and back into the recreation room. (Id. at ¶ 6.) He claims he was told that he would be allowed to leave the room as soon as Dr. Kuhn was removed from the area. (Id. at ¶ 7.) After he stepped out, the inner door was locked and Dr. Kuhn and the other two inmates were allowed to leave. (Id.) Collins claims he then repeatedly asked prison officials controlling the doors to unlock the inner door and let him out, but despite ample opportunity, they refused to do so. (Id.; Collins' First Declaration (10/1/92) at ¶¶ 4–7.) He claims their refusal to open the inner door caused the beating he received from the other inmates. (Collins' First Declaration at ¶ 8.) Collins also claims that the inner door was not unlocked again until *after* he was beaten, at which time the rioting inmates grabbed the door and tied it open. (Collins' Second Declaration at ¶ 10.) He also claims that, during the entire thirty (30) minute period that he was being beaten, he repeatedly cried for help to prison staff witnessing the assault, including Officers Kahelski and Young, who made no attempt to stop it. (Complaint at 3–4; Collins' First Declaration at ¶¶ 9–12.)

As to the use of tear gas to quell the disturbance, Collins now claims that the chemical agent caused him additional and continuing pain and suffering. (Collins' First Declaration at ¶¶ 18, 21.) He claims officials used the gas in complete disregard of his injuries and in complete disregard of his need for immediate medical care. (Id. at ¶ 20.) He also claims he was not given sufficient time to wash the chemical agent from his body after being removed from the recreation area. (Id. at ¶ 21.)

As to his medical treatment, Collins claims he has repeatedly complained of agonizing pain in his lower right jaw and that prison medical staff, with Officers Young and Kahelski supervising, refused to x-ray or treat his injuries. (Id. at ¶ 21.) The first time such a complaint shows up in his medical records, however, is on June 26, 1988, nine days after this lawsuit was filed. (Wood Aff. at Ex. Y, p. 5.) There he complains of morning stiffness in his jaw and of pain when he chews, and further complains that "they keep telling me there's nothing wrong." (Id. at pp. 5–6.) He now alleges that the x-rays taken immediately after the disturbance did not include his lower jaw. (Collins' Reply Brief at ¶¶ 1, 3.)

## LEGAL ANALYSIS

### I. SUMMARY JUDGMENT

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, an-

---

2. Collins did mention a request he made to Inmate Tucker that the beating be stopped. (Id. at 3.) And an incident report dated February 4, 1985, the day of the disturbance, shows that at 8:37 p.m., roughly six (6) hours after the incident, Collins called a relative to say that he was hurt in a "semi riot" and that "prison officials could have got him out of the situation a lot sooner than they did." (Knick Aff. at Ex. N.) This vague statement is the only contemporaneous piece of information indicating that Collins blamed prison officials in any way for the beating he received.

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Summary judgment is no longer a disfavored remedy. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Id.,* at 327, 106 S.Ct. at 2555. It "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.,* 794 F.Supp. 328, 330 (E.D.Mo.1992). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law", *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

█ The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 186 (1987).

"Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* Rather, the standard for summary judgment is now the same as that for a directed verdict: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512. Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corporation,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511. Such principles insure that summary judgment is utilized "when it can be shown that a trial would serve no useful purpose." *Windham v. Wyeth Laboratories, Inc.,* 786 F.Supp. 607, 610 (S.D.Miss.1992).

## II. STANDARD OF REVIEW

### A. General standards.

█ The Court must also analyze summary judgment motions within the context of the legal standards governing the specific claims at issue; here, the standards governing claims under the Eighth Amendment. When composing the Eighth Amendment's prohibition against cruel and unusual punishments, "the primary concern of the drafters was to proscribe 'torture[s]' and other 'barbar[ous]' methods of punishment." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), quoting Granucci, *Nor Cruel and Unusual Punishment Inflicted: The Original Meaning,* 57 Calif.L.Rev. 839, 842 (1969). In the *Estelle* case, however, the U.S. Supreme Court "first acknowledged that the provision could be applied to some deprivations that were not specifically part of the sentence but were suffered during imprisonment." *Wilson v. Seiter,* —— U.S. ——, ——, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991). But courts are wise to proceed

with caution. "Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny...." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). "After incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Id.,* quoting *Ingraham v. Wright,* 430 U.S. 651, 670, 97 S.Ct. 1401, 1412, 51 L.Ed.2d 711 (1977). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Id.* "[A] federal court should not, under the guise of enforcing constitutional standards, assume the superintendence of jail administration." *Alberti v. Klevenhagen,* 790 F.2d 1220, 1223 (5th Cir.1986).

## B. Specific standards and application.
### 1. Failure to protect.

■■■ The parties agree that, notwithstanding the foregoing principles of judicial restraint, "the Eighth Amendment prohibition against cruel and unusual punishment has been expanded under the Due Process Clause of the Fourteenth Amendment to impose upon both federal and state correctional officers and officials the obligation to take reasonable steps to protect inmates from violence at the hands of other inmates." *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988). The parties do not agree, however, on the legal standard that should govern such a claim in the context of this case. Collins argues that his failure-to-protect claim should be governed by a "deliberate indifference" standard, and the case law generally supports that position. That is, "[w]hen a correctional officer or prison official *intentionally* exposes a prisoner to a known risk of violence at the hands of another prisoner, he breaches the duty imposed upon him and deprives the victim of the security to which he is constitutionally entitled,...." *Id.,* at 649–50. "Negligence, or even gross negligence, on the part of a prison official will not

establish a constitutional violation." *Id.,* at 650. "Rather, because the Eighth Amendment speaks only to 'punishment', prison officials who fail to prevent an injury inflicted by fellow prisoners are liable only where those officials possess the requisite mental state." *Duane v. Lane,* 959 F.2d 673, 676 (7th Cir. 1992). Thus, "a prison official will be held liable for failing to protect an inmate from attacks if that official acts with 'deliberate indifference'." *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). "In order to show 'deliberate indifference', a plaintiff is required to prove that the prison official's action was deliberate or reckless in the criminal sense." *Id.* "Criminal recklessness" is "actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Id.,* at n. 7, quoting *Duckworth v. Franzen,* 780 F.2d 645, 652 (7th Cir.1985).

Defendants argue that Collins' claim should be judged by a stricter "malicious and sadistic" standard, because unlike the cases cited above and by Collins, this case involves a failure-to-protect within the context of a prison riot. There is strong support for this position as well. As is stated above, "[U.S. Supreme Court] cases say that the offending conduct must be *wanton.*" *Wilson,* —— U.S. at ——, 111 S.Ct. at 2326. (Emphasis in original.) "*Whitley* makes clear, however, that in this context wantonness does not have a fixed meaning but must be determined 'with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged.'" *Id.,* quoting *Whitley,* 475 U.S. at 320, 106 S.Ct. at 1084. "Where (as in *Whitley* ) officials act in response to a prison disturbance, their actions are necessarily taken 'in haste, under pressure,' and balanced against 'competing institutional concerns for the safety of prison staff or other inmates.'" *Id.* "In this setting, a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Whitley,* 475 U.S. at

320, 106 S.Ct. at 1084. Rather, "[i]n such an emergency situation, [the Supreme Court] found that wantonness consisted of acting 'maliciously and sadistically for the very purpose of causing harm.'" *Id.*

The Court finds Defendants' position more persuasive because it more adequately and appropriately gives the necessary and due regard to the conduct against which the Eighth Amendment objection is made. Collins fails, however, to avoid summary judgment under either standard, for two reasons. First, under either standard, the disputed facts are not *material* because, even if they are taken as true, Collins still fails to offer any evidence whatsoever as to an essential element of his claim. Second, even if the disputed facts were material, the dispute concerning those facts is not *genuine.*

### (a) Disputed material facts

There are clearly disputed issues of fact between the parties. Defendants claim that Collins was not with Dr. Kuhn and the other two inmates when the same asked to leave. They claim that Collins did not approach the inner door (or at least not until after Kuhn and the others left) and that they did not hear Collins ask to leave or cry for help, and could not get Collins out in any event because the riotous inmates tied the inner door open. Collins, on the other hand, claims that he was with Dr. Kuhn and the other two inmates when they requested to leave, and that he was purposely singled out by prison officials to go back into the recreation room. (Collins' Second Declaration at ¶¶ 5–7.) He claims that after Kuhn and the others left, he repeatedly asked to be let out, and that prison officials still refused to do so. (Id.) He further claims that officials had "ample opportunity" to unlock the door and let him leave without posing significant danger to themselves or other prison staff. (Collins' Second Declaration at ¶ 7; Collins' First

Declaration at ¶ 6.) His evidentiary support for this conclusion is his affidavit stating that "[t]he inmates involved in the disturbance did not immediately attack me or become overtly aggressive". (Collins' Second Declaration at ¶ 7.)

The flaw in Collins' case is obvious: If the alleged decision to order Collins back into the recreation room and then refuse to let him out occurred at a time when the inmates involved in the disturbance had not become "overtly aggressive", as Collins claims, then Collins cannot possibly show that the decision was made with "actual knowledge of impending harm" or "maliciously and sadistically for the very purpose of causing harm", elements essential to his claim under either legal standard. All Collins can show is that prison guards told one inmate who agreed to come forward and be handcuffed to return to a room containing inmates who refused to come forward and be handcuffed. There could be any number of reasons for such an action, and Collins utterly fails to offer any evidence that it was done with knowledge that it would cause him harm or maliciously and sadistically for the very purpose of causing him harm.[3] Thus, Collins fails to make a showing sufficient to establish an element essential to his claim. He fails to establish the requisite mental state of the Defendants under either standard.

### (b) Genuine issue of material fact

Even if the disputed facts were deemed material, issues of fact must not only be material to preclude summary judgment, they must be genuine. To be genuine, there must be sufficient evidence upon which a reasonable jury could find in favor of the nonmovant. Collins fails to meet this test. His case is extremely weak. His current version of events is uncorroborated by any other eye-witness accounts of what took place.[4] It largely contradicts the statement

---

**3.** In fact, the evidence offered by Collins shows the contrary, because he claims the situation had not yet become violent or dangerous.

**4.** Although not raised by Collins, Dr. Kuhn gave statements to Detective Peters after the disturbance which indicate that Collins wanted, and requested, to leave the room. His written statement reads as follows:

Shortly after starting the therapy group, Ivy Tucker walked over to the tape player and turned on a music station. When I asked him what he was doing he indicated he wanted to listen to music. I indicated that the group could not continue with the music playing and he continued to refuse to allow me to turn it off. He stood between me and the radio. I indicated that the group would be terminated

he gave to Detective Peters immediately after the incident. In fact, Collins' earlier statement confirms *Defendants'* version of events. He stated that he did not approach the exit until after Kuhn and the others left and that before he could get out 3 or 4 of the rioting inmates tied open the inner door. The 7th Circuit has repeatedly stated that "a party should not be allowed to create issues of credibility by contradicting his own earlier testimony." [5] *Essick v. Yellow Freight Systems, Inc.,* 965 F.2d 334, 335 (7th Cir.1992), quoting *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861 (7th Cir.1985). "In so holding, [the 7th Circuit] noted that if [it] allowed a party to create a genuine issue of material fact by changing his prior testimony: the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses—would be severely undercut." *Id.* Thus, considering Collins' weak testimony in light of the affidavits of four prison guards (and the written statements of others) who witnessed the events, all of which support Defendants' story, Collins' chances of success are negligible at best. On this record, the evidence is so one-sided that a reasonable jury could not return a verdict in his favor. Even though "[t]he trial court must view all evidence in the light most favorable to the party opposing the motion for summary judgment ... drawing all inferences in favor of the nonmovant", *Santiago,* 894 F.2d at 221, the Court is not required to allow a case to go to trial on the possibility of a verdict that it would consider inherently unreasonable. Defendants' motion must be granted.

### 2. The use of tear gas.

■ The claim that tear gas was used to quell the disturbance in violation of the Eighth Amendment is also dismissed. As stated above, the actions that a prison official takes to quell a disturbance within the prison do not constitute cruel and unusual punishment unless the actions were taken "maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1084–85. "[S]uch factors as the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted, ... are relevant to that ultimate determination." *Id.,* at 321, 106 S.Ct. at 1085. In applying the standard, "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.,* at 321–22, 106 S.Ct. at 1085. "Accordingly, in ruling on a motion for a directed verdict in a case such as this, courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." *Id.,* at 322, 106 S.Ct. at 1085. "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the stan-

---

at that time. Albert Holman was concerned that this might be a dangerous situation for me to be in and indicated for me to leave. I was not aware that the cameras had been covered at that time and left immediately. **Inmates Robinson and Balmaras left with me. Inmate Collins wanted to leave at that time but couldn't because the door was locked.** (Knick Aff. at Ex. I; emphasis supplied.) Kuhn also gave an oral statement where he noted that Collins "did not want to participate" in the uprising and had "requested to leave the room". (Knick Aff. at Ex. S.) Of course, nothing in these statements supports Collins' claim that prison officials repeatedly refused to let him leave despite ample opportunity to do so. And the phrase contained in his written statement that "Collins wanted to leave at that time" does not state that Collins was present with Kuhn and the other inmates when they requested to leave and

certainly does not support Collins' claim that a prison official specifically directed Collins to exit the sally port area so that he could be left inside with the riotous inmates. In fact, reasonably read, both statements are entirely consistent with Defendants' claim that Collins could not leave the room because the riotous inmates tied open the inner door, thereby locking the outer door(s) and rendering intervention by the guards difficult and extremely dangerous.

5. While *Essick* and the cases cited therein dealt with sworn testimony, Collins' earlier statement was contemporaneous with the event in question and bears a degree of reliability similar to the "present sense impression" and "excited utterance" exceptions to the hearsay rule. F.R.E. 803(1) & (2).

dard we have described, the case should not go to the jury." *Id.*

With these principles in mind, the 7th Circuit draws clear lines for the proper and improper use of tear gas:

> We have held, and now restate that it is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of emotional distress. . . . The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners does not constitute cruel and unusual punishment.

*Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir.1984).

There is no showing here that the amount of tear gas used to quell the disturbance was excessive. Nor could a reasonable juror draw the inference that it was used for the sole purpose of punishment or inflicting emotional distress. By the time the tear gas was used, it is undisputed that a group of prisoners had taken over a small portion of the institution by intimidation and force. They disobeyed direct orders to relent and be handcuffed. They took steps to prevent prison officials from entering the area (tying open the inner door) and to prevent them from monitoring what was occurring inside (breaking surveillance cameras and covering windows). They used pieces of the broken cameras as weapons to batter down doors. They beat one inmate (Collins) and used his bloody visage in an effort to threaten and intimidate prison officials from using force themselves. Short of hand-to-hand combat with several violent and possibly armed inmates (an option posing a serious threat of injury to both guards and inmates), the Court fails to see any alternative to tear gas. Collins certainly does not offer any. The situation here was at least more dangerous than that posed in *Soto*, where the 7th Circuit upheld the use of mace in a prisoner's cell because the prisoner refused to be handcuffed. *Soto*, 744 F.2d at 1263–66, 1270–71. Thus, under these dangerous circumstances,

the use of tear gas to quell the disturbance was clearly reasonable.

### 3. Failure to provide adequate medical care.

■ Claims for inadequate medical care are governed by the "deliberate indifference" standard first announced by the U.S. Supreme Court in the *Estelle* case, cited earlier. Even though this standard is not as strict as the "malicious and sadistic" standard applied above, Collins' claim clearly cannot stand.

Collins does not dispute that he was given medical care after the disturbance was quelled. First, he received an immediate shower, eye rinse and change of clothes. This was intended to remove the tear gas from his person and prevent potential side effects. Second, his injuries were treated by the prison nurse, and then later that night by doctors at Waupun Memorial Hospital, where he was x-rayed and released. Third, he spent the next two days in the prison infirmary for further observation and treatment. So it is not the lack of treatment which Collins objects to, but the quality of treatment. He claims that he was not sufficiently cleansed of the tear gas and that doctors neglected to take (and now refuse to take) proper x-rays of his lower jaw after the beating. But claims such as these, sounding in malpractice, are clearly not actionable under the Eighth Amendment:

> . . . in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

> \*    \*    \*    \*    \*    \*

"Certainly an X-ray of [Gamble's] lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing." But the question whether an X-

ray—or additional diagnostic techniques or forms of treatment—is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice. . . .

*Estelle*, 429 U.S. at 105–07, 97 S.Ct. at 292–93.

Additional x-rays have not been ordered for Collins because the initial x-rays of his "facial bones" showed no fractures of any kind. (Wood Aff. at Ex. Y, p. 5–6.) While this may be an unsound medical judgment (and the Court does not mean to imply that it is), it certainly is not a violation of the United States Constitution. The same follows for the manner in which tear gas was washed from Collins' person.

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Plaintiff's motion for summary judgment is denied;

2. Defendants' motion for summary judgment is granted;

3. Plaintiff's motions for substitution, for appointment of counsel, and to amend the complaint are denied as moot; and

4. The case is dismissed, upon its merits, and with prejudice.

**SO ORDERED.**