Nathan MILLER, Plaintiff–Appellant,

v.

Emery LEATHERS, Officer,
Defendant–Appellee.

No. 88–7651.

United States Court of Appeals,
Fourth Circuit.

Argued June 8, 1989.

Decided Sept. 12, 1989.

Philip Azar, Student Counsel (Steven H. Goldblatt, Director; Dori K. Bernstein, Maureen F. Del Duca, Supervising Attys., David L. Engelhardt, Student Counsel, Appellate Litigation Program, Georgetown University Law Center, on brief), for plaintiff-appellant.

Howard Edwin Hill, Associate Atty. Gen. (Lacy H. Thornburg, Atty. Gen., on brief) for defendant-appellee.

Before HALL, WILKINSON and WILKINS, Circuit Judges.

WILKINSON, Circuit Judge:

Here we must determine if the district court erred in granting summary judgment to a defendant prison guard whom the plaintiff inmate alleged had used excessive force against him in violation of his constitutional rights. We find that the grant of summary judgment was proper and affirm.

### I.

Appellant Nathan Miller is incarcerated at Central Prison in Raleigh, North Carolina, for armed robbery. On January 3, 1987, Miller filed a grievance against Officer Emery Leathers to resolve various ongoing difficulties with him. On January 7, 1987, the prison superintendent, after reviewing the grievance, decided in Leathers' favor, finding that Leathers had conducted himself "in a professional manner" when dealing with Miller and other inmates.

Later that day, Leathers was instructed to deliver a grievance form to appellant, on which the superintendent had noted his decision. Appellant had demonstrated a proclivity for violence and assaultive behavior. Between March 1, 1978 and November 22, 1986, he had committed some twenty-seven disciplinary infractions, involving, among other things, possession of weapons, physical assaults, and threats of physical harm against numerous prison officials. Appellant was thus in close custody and administrative segregation when Leathers left the form with him and instructed him to sign it.

Miller claimed Leathers delivered the form "with a very nasty attitude." Miller refused to sign the form, and a brief verbal confrontation ensued between the parties. During this time, Miller, who is white, referred to Leathers as a "slush-headed nigger" and threatened him with physical harm. Finally, Miller signed the form and returned it to Leathers. Leathers then left the cellblock and proceeded to the cellblock control station where he obtained a pair of handcuffs. He then reentered appellant's cellblock and returned to appellant's cell.

Upon returning to appellant's cell, Leathers claimed he told Miller to get dressed because he was taking him to see the Sergeant or the Lieutenant. Leathers handcuffed Miller and directed the officer in the control booth to open his cell door. When the door opened, the parties moved toward one another so that they were face to face, virtually touching. At this point, Miller concedes he again threatened Leathers with physical harm and repeated his racial taunts. Leathers contends Miller also refused orders, kicked him in the ankle, and spit in his beard, but this is a matter of dispute. Leathers then instructed appellant to proceed toward the cellblock exit. After proceeding downstairs, Leathers directed Miller toward the exit. Appellant moved forward several steps and then re-

fused to proceed any further. At that point, Miller contends that Leathers said he was a "punk and wanted some dick." Miller concedes he then turned to face Leathers, responding "yes, just like your mama." A brief scuffle ensued and Leathers struck appellant with his baton three times. Appellant caught and blocked the first blow between his handcuffs, but the other blows struck him on the arms. Appellant then armed himself with a broomstick from a nearby mop closet and charged Leathers. Leathers and other officers subdued him and he was escorted to the Emergency Room of Central Prison Hospital.

At the infirmary, Miller was examined by Physicians' Assistant Ray Drewry. X-rays revealed that appellant's right forearm had suffered a minor fracture approximately two centimeters long. A short arm cast was applied on January 12, 1987, and removed on March 16, 1987. X-rays showed satisfactory healing.

On February 9, 1987, appellant filed a complaint pursuant to 42 U.S.C. § 1983, alleging that on January 7, 1987, defendant had used excessive force against him in violation of his constitutional rights. On March 17, 1988, Leathers filed motions to dismiss and for summary judgment. On May 6, 1987, the district court granted Leathers' motion for summary judgment concluding that appellant failed to allege sufficient evidence to meet the test for excessive force. Specifically, the court found that there "was a need for application of force, that the amount of force employed was not disproportional to the need, and that the injury inflicted upon plaintiff was *de minimis.*" The district court concluded that "the force was applied in a good faith effort to discipline" Miller. This appeal followed.

Miller argues that the question of whether Officer Leathers used excessive force against him presents an issue of triable fact. We believe, however, that the applicable Supreme Court precedents reflect a recognition that confrontations between guards and inmates in the prison setting are legion, and that every altercation with

two sides to it does not render judgment inappropriate as a matter of law.

It is clear that "the unjustified striking, beating, or infliction of bodily harm upon a prisoner by the police or a correctional officer gives rise to liability under 42 U.S.C. § 1983." *King v. Blankenship,* 636 F.2d 70, 72 (4th Cir.1980). Section 1983, however, "is not itself a source of substantive rights." *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979). Rather, it provides "a method of vindicating federal rights elsewhere conferred." *Id.* Thus, "[i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor,* —— U.S. ——, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). In most cases, either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments is implicated. *Id.* Here, since the incident took place after appellant's conviction, the Eighth Amendment "serves as the ... source of substantive protection." *Whitley v. Albers,* 475 U.S. 312, 318, 327, 106 S.Ct. 1078, 1083, 1088, 89 L.Ed.2d 251 (1986). While the particular setting of *Whitley* involved a prison riot, the standard announced in that case is not limited to the quelling of institutional disturbances. The *Whitley* standard applies to any "claim of excessive force to subdue [a] convicted prisoner," *Graham,* 109 S.Ct. at 1871, or to "prophylactic or preventive measures intended to reduce the incidence of ... any other breaches of prison discipline." *Whitley,* 475 U.S. at 322, 106 S.Ct. at 1085. *See also Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

 Recognizing that a plethora of lawsuits against prison authorities might itself be inimical to prison discipline, the Supreme Court made the Eighth Amendment standard a difficult one to satisfy. For conduct to be a violation of Eighth Amendment rights, it "must involve more than ordinary lack of due care for the

prisoner's interests or safety." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084. The infliction of pain is not cruel and unusual punishment "simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable." *Id.* "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id.* In determining whether force was used merely to inflict unnecessary and wanton pain, " 'such factors as the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted' " must be considered. *Id.* at 321, 106 S.Ct. at 1085, *quoting Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973).

■ Here, Leathers' use of force did not transgress Eighth Amendment standards. Leathers knew that appellant had a proclivity for violence. Moreover, moments prior to the incident, Miller had directed a racial insult at Leathers, calling him a "slush-headed nigger," and had threatened Leathers with physical harm. Miller concedes in his own deposition testimony that he made a deliberate decision to provoke Leathers so that Leathers would write him up for a disciplinary infraction. When appellant refused to obey Leathers' instruction to proceed through the cellblock exit, and turned around to confront him, while sexually insulting Leathers' mother, Officer Leathers "reasonably perceived" that he was being threatened with bodily harm. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. To have reacted by striking appellant three times was not wanton or unnecessary in this context.

Miller's contention that Leathers used force maliciously and wantonly because appellant had filed a grievance against him is without merit. The grievance proceeding was one in which Leathers had prevailed. Absent from the incident also are the more obvious indicia of a retaliatory beating. Leathers did not strike Miller in the head, groin, or from behind, nor while he was prostrate. He struck a defiant and diso-

bedient inmate who had previously threatened him and who had turned on him in a manner indicative of an intent to carry out those threats. He struck appellant in the obvious area of the body he would use in an attack upon Leathers, his handcuffed arms and fists. It is true Leathers struck Miller three times. The three blows were necessary, however, because Miller caught and blocked the first blow between his handcuffs, and then laughed and taunted ·Leathers, telling him "his mama could hit harder than he was doing"—an indication that the first blow was not harmful and had not deterred appellant.

■ Miller contends in his brief that Leathers acted in violation of prison regulations by removing Miller from his cell outside the supervision of a higher authority. If such is the case, it is a matter between Leathers and his supervisors. It is not dispositive, however, of the present action. Indeed, if violations of internal prison regulations were conclusive of § 1983 liability, prison authorities might either be reluctant to promulgate strict rules of conduct for prison guards or be prone to cover up infractions.

We do not adopt a rule that sufficient verbal provocation will permit a prison guard to avoid § 1983 liability for the use of wanton and malicious force. We recognize, moreover, that prison vernacular is often coarse and that this quarrel, like any other, has two sides. The ill feeling between guard and inmate was considerable; their dealings were never marked by courtesy on either side. Every disputed fact between altercants is not a material fact for purposes of summary judgment; however. In the summary judgment context, it is not the judge's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Ballinger v. North Carolina Agricultural Extension Service,* 815 F.2d 1001, 1004–05 (4th Cir.1987). Thus, appellant could have survived summary judgment here "only if the evidence viewed in the light most favor-

able to him [went] beyond a mere dispute over the reasonableness of the force used and ... support[ed] a reliable inference of the wantonness in the infliction of pain." *Brown v. Smith,* 813 F.2d 1187, 1188 (11th Cir.1987).

Here the evidence did not. Section 1983 does not displace all adjudicative authority on the part of prison officials or compel courts to umpire every altercation behind prison walls. "[M]anagement by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force." *Johnson,* 481 F.2d at 1033. The threat to prison authority here was apparent. Not content with the outcome of the grievance process, Miller admits, both in his complaint and in his brief before this court, that he threatened Leathers with physical harm, directed racial insults at him, and cast sexual aspersions on his mother. By his own admission, he embarked on a deliberate course of conduct designed to provoke Leathers into writing him up, or, perhaps, into an incident for which legal action might lie. Further, he turned on Leathers at the exit to the cell-block in direct defiance of an order to proceed. In such circumstances, some deference must be accorded prison guards forced to choose between the risks of becoming defendants in a § 1983 action and of sustaining bodily injury themselves. While restraint in the face of provocation may still have remained the course of wisdom, we cannot say that the measured force employed on Miller's handcuffed wrists was of a wanton and obdurate kind.

The judgment of the district court is

AFFIRMED.

**K.K. HALL,** Circuit Judge, dissenting:

I dissent from the majority's decision because I believe that the record below, when viewed in the light most favorable to Miller, shows the existence of a genuine issue of material fact sufficient to withstand the motion for summary judgment. Miller's version of the events surrounding the infliction of his injuries differs in several significant respects from that recounted in the majority's opinion, and a comparison between the two serves to illuminate why this case should have been permitted to proceed further.

I.

We are not confronted with a judgment reached after a trial in which the credibility of the witnesses could be judged by the trier of fact. Instead, this appeal involves only the pleadings, deposition testimony and various exhibits. Our review is *de novo* and, therefore, we are constrained to review the record under the same standards employed by the lower court. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1127–28 (4th Cir.1987). The majority baldly asserts that Leathers "reasonably perceived" that he was being threatened with bodily harm and that his actions were justifiable.[1] The selective assembly of facts and allegations supporting the majority's conclusion ignores the long-established standard for evaluating summary judgment motions: the facts and inferences to be drawn from the facts must be viewed in the light most favorable to Miller, and he is entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all

---

1. The majority applies the standard announced in *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), to the facts of this case. In *Whitley,* a five-member majority held that, in the context of a prison riot, the established Eighth Amendment standard of "the infliction of unnecessary and wanton pain" turned on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm." *Id.* at 320, 106 S.Ct. at 1084. Whether a malicious and sadistic intent is a prerequisite to an Eighth Amendment violation in other contexts is still an open question. *Id.* at 328, 106 S.Ct. at 1088, Marshall, J., dissenting; *see also Morgan v. District of Columbia,* 824 F.2d 1049, 1057 (D.C.Cir.1987) (an express intent to inflict suffering is never required to prove an Eighth Amendment violation). Because I believe that Miller's claim should survive summary judgment under even this heightened standard, it is unnecessary to discuss the issue further.

internal conflicts in it resolved favorably to him." *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979). I will analyze the record accordingly.

## II.

On January 3, 1987, Miller filed a grievance with the prison administration complaining that Officer Leathers had told another inmate that he (Miller) was a "snitch." A correctional officer investigated the grievance by merely discussing it with Leathers and came to the conclusion that the "investigation reveals that there is no merit to inmate's complaint." If the truth of Miller's grievance is assumed, and there is nothing in the record beyond the investigator's "finding" to rebut it, then there is an ample basis to support an inference that Leathers harbored a pre-existing hostility towards Miller. Although the majority characterizes the grievance as an attempt "to resolve ongoing difficulties with [Leathers]," it is impossible to minimize the possible consequences of being labelled a "snitch." *See Harmon v. Berry,* 728 F.2d 1407, 1409 (11th Cir.1984) (§ 1983 claim by inmate, alleging that prison officials endangered him by labelling him a "snitch," allowed to proceed past service of process stage). It was this grievance form, with the investigator's finding of "no merit," that Leathers brought to Miller's cell on January 7, 1987.

Upon receiving the form, Miller refused to sign it and a verbal confrontation ensued. Miller admits that he decided to verbally provoke Leathers in an attempt to get his grievances before higher authorities; however, he alleges that the threats and insults flowed both ways and that at one point, Leathers threatened to "kick [Miller's] white ass." Miller eventually signed and returned the form, but Leathers nevertheless decided to bring him out of his cell "to see the sergeant or lieutenant." Leathers then removed Miller from his cell, handcuffed him and began to escort him down the hall.[2]

According to Miller, the verbal sparring continued as Leathers escorted Miller off the cellblock and down a flight of stairs; this trip was punctuated by several blows from Leathers' riot baton to Miller's back. Upon reaching a doorway which Miller claims was blocked by a food cart, he refused to move forward. Turning toward Leathers, Miller claims that Leathers insulted him and that he responded in kind. At this point, Leathers raised his baton and Miller raised his handcuffed hands to ward off the impending blow. He was struck, laughed at Leathers and was struck twice more. Miller also alleges that Leathers twice threatened to kill him during the incident. Miller sustained a fractured arm and a swollen elbow. Miller reacted by pushing the officer away and picking up a broom handle to protect himself. With the aid of some nearby officers, Miller was eventually subdued.

The district court, upon consideration of the materials submitted by both parties pursuant to Leathers' motion for summary judgment, concluded that there was a need for the application of force, that the amount of force was not disproportionate to the need, that the injuries inflicted were *de minimis,* and that the force used was applied in a good faith effort to discipline Miller and was both reasonable and justified on the basis of the facts then known to Leathers. Thus, the district court concluded that Miller had no basis for recovery, and the majority agrees. I do not.

## III.

The majority bases its finding that there was a need for force on the following:

---

**2.** Prison regulations require that the removal of a disruptive inmate from his cell shall only be accomplished in the presence of a sergeant or higher-ranking officer. Miller contends that this regulation was violated when Miller was taken from his cell on January 7. The prison regulation's requirement of an officer's presence during removal of a disruptive inmate is arguably a response to the need to protect against the type of abuse complained of by Miller and, on the other side of the coin, as a precautionary measure to bolster the evidence against false allegations of abuse by staff. It is not unreasonable to infer, as Miller contends, that his removal from the cell in handcuffs was the initial step in Leathers' plan to harm Miller out of the sight and sound of other inmates or higher-ranking officers.

Miller's history of violence within the prison, his insults towards Leathers, his admitted plan to provoke Leathers in order to be written up, his refusal to obey Leathers' command to proceed through the doorway, and his act of turning around and insulting Leathers' mother. However, Miller's allegations directly contradict the majority's conclusion that Miller "turned on [Leathers] in a manner indicative of an intent to carry out [his] threats." Maj. Op. 154. If Miller's version of the facts is to be believed, as it must at this point, he makes more than a colorable claim that Leathers intended to provoke an incident in which he would be able to injure Miller under the guise of protecting himself. Miller's allegations also support a view that, unable to proceed through the doorway, he turned only to respond to Leathers' latest salvo in their ongoing battle of insults and that Leathers reacted to the insult, not to any threat.

The majority's recitation of the facts do not capture the flavor of the incident conveyed by Miller's deposition testimony. According to Miller, the insults and coarse language flowed both ways from the outset, and Miller's fear of being harmed first arose when he was ordered to come out of his cell and be handcuffed. He characterized the jabs to his back as an attempt by Leathers to "start something." Most critically, Miller alleges that he raised his shackled limbs only to defend himself from the impending blow from Leathers' baton. Nothing in Miller's testimony evinces an intent to confront Leathers or to threaten him with physical harm at that juncture, and he raises at least a reasonable inference that his injuries were wantonly and unnecessarily inflicted. This is sufficient to create a genuine issue of material fact, *i.e.*, whether Leathers had a reasonable basis to exert the force he did.

I am sympathetic to the policy concerns noted by the majority. Prisons are places of unrelenting tension between guards and the guarded. Correctional officers must contend with the most intractable members of society, and their compensation for performing this unenviable but essential task is often woefully inadequate. Nevertheless, I am compelled to dissent because I believe, under the established standard of review, that Miller's case should not have been disposed of by summary judgment on the existing record. The fact that the Eighth Amendment standard of liability is a difficult one to satisfy does not justify a diminished adherence to the standard for determining summary judgment motions.