73 F.3d 364
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 Troy R. GIBBONS, Plaintiff-Appellant,
v.
J. HIGGINS, Conduct Adjustment Board Chairman, Officer J.
Melly, Scott Roberts, Conduct Adjustment Board
Members, Defendants-Appellees.
[2]
 No. 94-2636.
 United States Court of Appeals, Seventh Circuit.
 Submitted Oct. 18, 1995.[1]
Decided Dec. 20, 1995.
 
 Before POSNER, Chief Judge, and CUMMINGS and BAUER, Circuit Judges.
 
 ORDER
 
 1
 During a shakedown of cells and strip search of inmates in the disciplinary segregation unit of an Indiana prison, plaintiff Troy R. Gibbons, standing naked in his cell, refused an order to submit to a visual body cavity (VBC) search by bending over and spreading his buttocks, insisting instead that he should be permitted to simply "squat and cough," as in previous VBC searches. The prison's quick response team (QRT) responded with several blasts from a high-powered water hose, causing Gibbons to hold up his mattress as a shield. After a second refusal and several more blasts, Gibbons was removed from his cell and placed in handcuffs and shackles. He later pled guilty before the prison Conduct Adjustment Board (CAB) to disobeying an order, and received a written reprimand. At the same time, he contested but was found guilty of a more serious charge, "physically resisting staff," and the CAB imposed a penalty of one-year disciplinary segregation.
 
 
 2
 After exhausting his administrative remedies, Gibbons filed this civil rights suit under 42 U.S.C. Sec. 1983 against the CAB members, seeking injunctive relief, "declaratory relief in the form of damages," and expungement of the disciplinary record. The district court later treated the complaint as a petition for a writ of habeas corpus. Gibbons alleged procedural due process violations stemming from the CAB's: (1) refusal to view, or to give Gibbons access to, a videotape of the strip search and cell extraction; (2) refusal to call any member of the quick response team as a witness; and (3) refusal to provide Gibbons with copies of similar "resisting staff" conduct reports given that same day to 27 other inmates on the unit.
 
 
 3
 The district court found a due process violation only with regard to the videotape.[3] It instructed the prison officials to provide either a new hearing prior to which Gibbons would be given access to the videotape, or in the alternative, proof that the due process violation was harmless because the videotape was not exculpatory. The court invited respondent[4] to submit the videotape for in camera review. Respondent filed an affidavit from the correctional officer in charge of the cell extraction, Lt. Michael J. Watson, who stated that he had watched the videotape and had concluded that it was not helpful to Gibbons. Watson stated:
 
 
 4
 The videotape does not show whether Gibbons was naked or clothed at the outset of the order to submit to a strip search. This is due to the angle of the camera. The audio portion of this videotape does not substantiate claims made by Offender Gibbons that he complied with orders to submit to a search.
 
 
 5
 The district court accepted that explanation. It noted that the CAB had still failed to explain how Gibbons resisted, but concluded that Gibbons did in fact resist when he refused the order to bend over, and when he held the mattress up as a shield.
 
 
 6
 The district court went on to deny Gibbons's petition to proceed IFP as to the remaining civil rights damages claim, finding the action frivolous pursuant to 28 U.S.C. Sec. 1915(d), because in the habeas action Gibbons had been unsuccessful in seeking expungement of the disciplinary findings, later citing Heck v. Humphrey, 114 S.Ct. 2364 (1994).[5] The court dismissed the damages action with prejudice.
 
 Discussion
 
 7
 As defendants concede, the district court was wrong to construe this procedural due process challenge seeking a new hearing as a habeas corpus petition. See Heck v. Humphrey, 114 S.Ct. at 2372; Graham v. Broglin, 922 F.2d 379, 381 (7th Cir.1991); Viens v. Daniels, 871 F.2d 1328, 1333 (7th Cir.1989). There is no question that Gibbons exhausted his administrative remedies. Thus, the mischaracterization of the complaint as a habeas corpus petition does not affect our discussion with regard to the procedural due process claim, the merits of which the district court fully addressed. We first review the procedural due process arguments.
 
 
 8
 The refusal to view, or to permit Gibbons access to, the videotape presents serious due process concerns.[6] Gibbons has the right to marshal facts in his defense and present witnesses and documentary evidence at the hearing, see Superintendent v. Hill, 472 U.S. 445, 454 (1985); Wolff v. McDonnell, 418 U.S. 539, 563-67 (1974); Rasheed-Bey v. Duckworth, 969 F.2d 357, 361 (7th Cir.1992); Mendoza v. Miller, 779 F.2d 1287 (7th Cir.1985); Chavis v. Rowe, 643 F.2d 1281, 1287 (7th Cir.1981), and the CAB cannot arbitrarily refuse to consider exculpatory evidence. Whitford v. Captain Boglino, No. 93-2660 (7th Cir. Aug. 4, 1995) (per curiam), 1995 WL 459230 at * 8; Viens v. Daniels, 871 F.2d 1328, 1336 n. 2 (7th Cir.1989). A videotape of a strip search, an attempted visual body cavity search, and a cell extraction using a high-powered water hose is potentially of great relevance when an inmate is charged with physically resisting staff. See, e.g., Barnes v. Fauver, 1993 U.S.Dist. Lexis 8453 (D.N.J. June 17, 1993) (permitting inmate to proceed with due process claim where prison hearing officer had refused to examine videotapes on basis that it was sufficient to examine only the corrections officers' incident reports; "This response is inadequate. Barnes's right to due process include his right to produce evidence at disciplinary hearings...."), aff'd. without opinion, 27 F.3d 555 (3d Cir.1994), 1994 U.S.App. Lexis 15655; Malik v. Tanner, 697 F.Supp. 1294, 1300 n. 7 (S.D.N.Y.1988) (if inmate had requested videotape of cell block prior to hearing, it would have been a violation of due process to refuse to consider the videotape); Muhammad v. Butler, 655 F.Supp. 1470 (D.N.J.1987) (prisoner not allowed to hear tape recording of telephone call in which he allegedly planned an escape; reasons for denying access to the evidence were unpersuasive; not enough to have summary of alleged contents of tape).
 
 
 9
 The CAB's explanation for the refusal of Gibbons's request ("not listed on report and will not be used")[7] is inadequate. While a disciplinary board need not give a reason for the denial of an inmate's request for witnesses or potentially exculpatory evidence contemporaneously with the hearing, it may later be required to provide reasons, and demonstrate that the "reasons are logically related to 'institutional safety or correctional goals.' " Ponte v. Real, 471 U.S. 491, 497 (1985). It is the prison's burden--not the inmate's--to prove the denial was not arbitrary or capricious. Ponte v. Real, 471 U.S. at 499. Here, there is no suggestion that the videotape could not be viewed by Gibbons because of prison security concerns, or any other correctional goals. Nor was any other acceptable reason offered. See Whitford v. Boglino, No. 93-2660 (7th Cir. Aug. 4, 1995), 1995 U.S.App. Lexis 20693 at * 24-25 ("after accepting affidavits containing exculpatory evidence, the committee must state its reasons for rejecting the exculpatory evidence"); Chavis v. Rowe, 643 F.2d 1281, 1287 (finding that a statement "we accept the reporting officer[']s charges" is a deficient explanation of its decision).
 
 
 10
 Nor did the district court's order requiring respondent to prove why the due process violation was harmless result in a supplemental statement from the CAB that could be considered an adequate explanation for the denial. Instead, the court was provided only with Lt. Watson's affidavit asserting his opinion that the videotape was not helpful, which is not a substitute for an explanation from the CAB. See Young v. Kann, 926 F.2d 1396 (3d Cir.1991) (due process violation where the disciplinary hearing officer relied on the oral summary, given outside of the inmate's presence, of the contents of a letter in which the inmate purportedly threatened his cellmate; the hearing officer did not himself review the letter, and refused to produce it at the inmate's request).
 
 
 11
 The district court here also did not view the tape in camera, although it had earlier invited the prison officials to provide the evidence for the court's review. See Campbell v. Henman, 931 F.2d 1212, 1215 (7th Cir.1991) (reversing district court finding that inmates were not entitled to in camera review of material that inmates believed would be exculpatory; "Minimum due process requires that the district court conduct an in camera review of the entire investigatory file (not only the material relied on to find guilt) to determine whether or not exculpatory information existed").
 
 
 12
 This failure to explain why the videotape was excluded is compounded by a disturbing lack of clarity in regard to how Gibbons "physically resisted staff."[8] Was it a refusal to strip, a refusal to bend over, a refusal to move up to the bars so he could be cuffed, or the act of holding up a mattress to protect himself from the high-powered water hose?[9]
 
 
 13
 When the district court ordered respondent to provide Gibbons with the videotape or establish that it was not exculpatory, Lt. Watson provided his affidavit, which stated that he gave Gibbons a "direct order to submit to a proper strip search and Offender Gibbons refused this order." Presumably this refers to the lesser charge of "disobeying an order," to which Gibbons pled guilty and was given a written reprimand. This is supported by the conduct report itself, which charges Gibbons with refusing an order, and notes that as part of the guilty plea Gibbons stated that he refused to comply because he believed the search was not proper.
 
 
 14
 Watson's affidavit goes on to describe the second, more serious charge of physically resisting staff:[10]
 
 
 15
 [Gibbons] resisted the extraction team's efforts to restrain him by not complying with orders to report to the bars to be restrained and shielding himself with a mattress.
 
 
 16
 This explanation does not even refer to the strip search, or the order and refusal to bend over for a VBC inspection. The conduct report is similarly terse but it fails to refer to not reporting to the bars to be cuffed, or using the mattress as a shield, or refusing to bend over and spread his buttocks for a VBC inspection; instead, the report refers only to a "direct order to submit to a proper strip search," and the resulting necessity to call the QRT to "physically restrain" Gibbons.
 
 
 17
 So, we do not know exactly what element of Gibbons's conduct the CAB considered "physically resisting"--the failure to bend over, the failure to move up to the bars to be cuffed, or holding the mattress as a shield. But we think that the procedural due process violation in refusing to review, or to permit access to, the videotape ultimately did not harm Gibbons. See Viens, 871 F.2d 1328, 1336; Chavis, 643 F.2d 1281, 1286.
 
 
 18
 Gibbons sought the tape because he hoped it would show that he never "resisted"--that he cooperated, as evidenced by the fact that he had stripped off his clothes as ordered, and was naked before the water hose was unnecessarily (he argues) used to gain his compliance; he was never ordered to move up to the bars to be cuffed; and he used the mattress as a shield only for protection, not to resist the search.
 
 
 19
 It seems unlikely that the failure to report to the bars to be cuffed was the basis of the "resisting" charge, since it was not even mentioned until Watson's affidavit.
 
 
 20
 The use of a mattress as a shield against the water hose also seems an unlikely candidate. Because of the sequence of events, it seems obvious that Gibbons did not raise the mattress as a resistant shield until the water canon was already being used to counter Gibbons's disobedience; presumably that means he offered resistance before the water canon was loosed upon him.
 
 
 21
 If the charged "resistance" was holding the mattress up as a shield, Gibbons argues that his conduct was an instinctual attempt to protect himself from harm. Gibbons also argues that the type of VBC inspection he was ordered to submit to was unlawful. An analogous context might be an individual resisting an unlawful arrest. In Indiana (as in most jurisdictions), an individual may not invoke the privilege of self-defense to justify resisting arrest, even when that arrest is unlawful. Sayles v. State, 513 N.E.2d 183 (Ind.App.1987); Fields v. State, 178 Ind.App. 350, 382 N.E.2d 972 (1978).
 
 
 22
 But Gibbons also alleges the use of excessive force, a claim not reached by the district court. Cf., e.g., Sheldon v. Pezley, 49 F.3d 1312 (8th Cir.1995) (disciplinary board was justified in rejecting prisoner's argument that the use of force--a pain compliance hold--was not necessary because he had already complied with the strip search orders). If excessive force is used to make an arrest (lawful or unlawful), many jurisdictions recognize the arrestee's right to respond with reasonable resistance. Indiana recognizes the right to defend against a police officer's use of excessive force. Plummer v. State, 135 Ind. 308, 34 N.E. 968 (1893) (if officer uses excessive force in making an arrest, the person can repel force by force in the reasonable exercise of self-defense); Casselman v. State, 472 N.E.2d 1310 (Ind.App.1985); City of Indianapolis v. Ervin, 405 N.E.2d 55 (Ind.App.1980); Williams v. State, 311 N.E.2d 619 (Ind.App.1974). This privilege exists "not because its use is necessary to protect him from an unlawful arrest, but because it is the only way in which he can protect himself from death or serious bodily harm." Restatement (Second) of Torts Sec. 65, comment f (1977).
 
 
 23
 Particularly in a prison context, however, we wonder whether this privilege is limited to situations where no alternative action would have protected the inmate: if the excessive force can be avoided by submitting to the allegedly improper order, the resistance would not be authorized. Under this reasoning, all Gibbons had to do was comply with the order to bend over, thus avoiding the allegedly excessive force (the water hose); he could later challenge the policy of requiring this particular type of VBC search. See Koss v. Michigan Dept. of Corrections, 184 Mich.App. 614, 459 N.W.2d 34 (1990) (inmate refused to bend over and spread buttocks; court held that while the inmate "may very well have good cause for a grievance that policy was violated," such cause is "not a valid excuse for noncompliance with a direct order").
 
 
 24
 However, we need not decide the interesting question of what level of resistance a prisoner is privileged to use against what he believes is an unlawful order implemented with excessive force. That question is relevant to the damages claim, and involves the issue of whether an inmate has a constitutional right to demand one type of VBC search (squat and cough) over another (bend over and spread buttocks), and may arise in the proceedings on remand.[11] Here we are only concerned with whether Gibbons's right to procedural due process was violated when the videotape was kept from him and was not reviewed by the CAB. No one disputes that the videotape would show what Gibbons has already admitted--that the mattress was used (after the refusal to submit to a "proper" VBC inspection), or for what purpose (shielding himself from the water bursts). Thus, Gibbons suffered no harm as to the mattress-shield resistance.
 
 
 25
 We also find the error to be harmless if refusing to bend over was considered to be "resisting."[12] Gibbons admits that he only partially complied with the VBC search since he stripped, but refused to bend over.
 
 
 26
 We are not suggesting that because there was some evidence of guilt (here, admitting that he refused to bend over), any potentially exculpatory evidence could simply be ignored. The CAB cannot arbitrarily refuse to consider exculpatory evidence "simply because other evidence in the record suggests guilt." Whitford v. Captain Boglino, No. 93-2660 (7th Cir. Aug. 4, 1995) (per curiam), 1995 WL 459230 at * 8, citing Viens v. Daniels, 871 F.2d 1328, 1336 n. 2 (7th Cir.1989). But this is not a case of the CAB's choosing to rely on "some evidence" from one source to support a finding of guilty, while ignoring favorable evidence from a different source; it is not a conflict between the guard's testimony and the inmate's testimony. Instead, it is Gibbon's own admission that makes the withholding of the videotape he requests ultimately harmless. So it does not matter whether the videotape shows cooperation, since Gibbons admits that he refused to fully comply with the guards' orders.
 
 
 27
 We conclude that any procedural due process violation resulting from the CAB's arbitrary refusal to view the videotape or to permit Gibbons access to the videotape was harmless and does not require a new disciplinary hearing.
 
 Other Witnesses/Other Conduct Reports
 
 28
 Gibbons alleges that a due process violation occurred when the CAB refused to call either one of the QRT members or its directing officer, Lt. Watson, as a witness at the hearing. However, they could offer little more than the information contained in the conduct report. True, the affidavits submitted to the district court merely add to the confusion of what Gibbons was charged with, since they only discuss whether Gibbons was willing to be cuffed, and his use of the mattress as a shield. Regardless, even if one of the QRT members had testified that Gibbons cooperated by stripping, the cooperation was only partial, and thus refusal to permit the testimony was harmless.
 
 
 29
 In regard to the other inmates' conduct reports, the due process clause would not require the CAB to review them because the question of whether Gibbons physically resisted staff or disobeyed an order does not rest on whether other inmates were involved in misconduct, particularly where there is no claim that Gibbons was treated less favorably than other inmates involved in the disturbance.
 
 Heck v. Humphrey
 
 30
 The district court stated that Heck v. Humprhey precludes a damages claim, presumably because he has not nullified the finding of guilty on the resisting staff charge. Recently, a debate has begun as to whether (or how) Heck v. Humphrey might apply in prison disciplinary cases.[13] We need not decide the question. Heck does not apply, disciplinary proceeding or not, since the success of Gibbons's suit for damages does not depend on establishing that either the judgment of conviction or the CAB finding of guilt is wrong. Gibbons can be guilty of resisting staff and still have been subjected to excessive force. Losing on the "resisting staff" charge is not necessarily conclusive as to a claim of excessive force arising out of the strip search incident. See Monroe v. Pape, 365 U.S. 167 (1961) (a lawful arrest can be accompanied with excessive force); Williams v. Liberty, 461 F.2d 325, 327 (7th Cir.1972) (same); Bemben v. Hunt, No. 93 C 509 (N.D.Ill. Jan. 23, 1995), 1995 WL 27223 at * 3, 1995 U.S.Dist. Lexis 725 at * 9 (conviction for resisting arrest is not conclusive with respect to allegations of excessive force).
 
 Section 1983 Damages Claims
 
 31
 Because they are not barred by Heck, Gibbons' damages claims can be considered by this court. A claim challenging the reasonableness of the force used by prison guards is typically based on the Eighth Amendment. While Gibbons does not refer to the Eighth Amendment in his pro se complaint or anywhere in the record, not raising it until filing a brief before this court, he did repeatedly argue in the district court that use of a water hose was unnecessary and excessive force.
 
 
 32
 In any event, Gibbons has failed to state an Eighth Amendment claim. The Eighth Amendment is violated only where the force used involves the unnecessary and wanton infliction of pain, and no liability arises if the guard uses reasonable physical force in good faith and in pursuit of legitimate penological or institutional objections. Hudson v. McMillian, 503 U.S. 1, 7 (1992) (extending Whitley, infra beyond the context of a prison riot, the Court held that "whenever prison officials stand accused of using excessive physical force ... the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"); Whitley v. Albers, 475 U.S. 312, 320-21 (1986) (holding that plaintiff must show that the force used against him was applied, not in a " 'good faith effort to maintain or restore order, [but] maliciously and sadistically for the very purpose of causing harm' "), quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973) (Friendly, J.). A plaintiff must show that "officials used force with 'a knowing willingness that [harm] occur.' " Farmer v. Brennan, 114 S.Ct. 1970, 1978 (1994).
 
 
 33
 No court has held that the use of a water hose is a per se violation of the Eighth Amendment. In determining whether force was excessive, i.e., whether the maliciousness standard has been met, relevant factors include: (1) the extent of the injury suffered; (2) the need for force, (3) whether the force was proportionate to the need, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response. Hudson, 503 U.S. at 7. Here, those factors clearly indicate that the force used against Gibbons was not constitutionally excessive.
 
 
 34
 Gibbons does not allege that he suffered any injury. See White v. Holmes, 21 F.3d 277, 281 (8th Cir.1994) (defendant entitled to judgment because prisoner suffered no injury). While an injury is not required in order to state an Eighth Amendment claim, Hudson, 503 U.S. at 6, the absence of any injury is "relevant to the Eighth Amendment inquiry," Hudson, 503 U.S. at 8, and is one factor that the court may consider in determining whether prison guards used force "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Hudson, 503 U.S. at 7. Absence of injury supports defendants' argument that the force used against the inmate was not applied maliciously and sadistically for the purpose of causing harm. See Lunsford v. Bennett, 17 F.3d 1574, 1582 (7th Cir.1994) (degree of injury is relevant to determining extremeness of force used; a minor injury like headaches that require no medical attention "supports our conclusion that at most this incident as a de minimis use of force not intended to cause pain or injury to the inmate"); Johnson v. Boreani, 946 F.2d 67, 71 (8th Cir.1991) ("absence of injury evidence in the record confirms that defendants could reasonably have believed that these conditions had not subjected [inmate] to the wanton infliction of pain or serious physical injury").
 
 
 35
 Some amount of force was needed to obtain Gibbons' cooperation. Prison officials had already spent several days attempting to restore official control over a turbulent segregation unit. The use of a water hose was a reasonable method to attempt to obtain compliance with orders being disobeyed by a number of inmates--including Gibbons--where other attempts made over a several-day period had failed.
 
 
 36
 When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force. While experts who testified on behalf of the plaintiffs suggested that rather than seek to enforce orders, it was possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, experience and common sense establish that a prison cannot be operated in such a way.
 
 
 37
 * * *
 
 
 38
 * * *
 
 
 39
 Mob rule would take over. There would not, and could not, be any protection for staff or inmates. Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them. Someone must exercise authority and control. One can quickly reason what would happen in a maximum security prison without proper discipline. Soto, 744 F.2d at 1267.
 
 
 40
 The amount of force used, two brief blasts from a water hose, cannot be considered excessive where Gibbons refused to submit to a strip search and would not come to the front of the cell to be handcuffed.[14] The fact that Gibbons was alone in a locked cell does not alter this conclusion. See Soto, 744 F.2d at 1270 (use of tear gas to "subdue recalcitrant prisoners" is not cruel and inhuman punishment even where "inmate is locked in his prison cell or is in handcuffs").[15] Cf. Collins v. Ward, 652 F.Supp. 500, 509 (S.D.N.Y.1987) (inmates argue that prison guards should have attempted to subdue them with less forceful means, such as water hose instead of tear gas).
 
 
 41
 Given the admissions made by Gibbons, as discussed above, it appears that the prison guards were attempting to perform a good faith sweep of the entire segregation unit. Gibbons has failed to submit any evidence that the guards acted maliciously and sadistically to cause him harm in the face of his refusal to obey direct orders. This conclusion is supported by abundant precedent. See, e.g., Michenfelder v. Sumner, 860 F.2d 328, 336 (9th Cir.1988) (policy of allowing use of taser guns on inmate who refuses to submit to a strip search does not constitute cruel and unusual punishment); Caldwell v. Woodford County, 968 F.2d 595, 600-01 (6th Cir.1992) (use of stun gun and straight jacket on inmate who refused to obey jailers' orders did not violate Eighth Amendment); Soto v. Dickey, 744 F.2d 1260, 1270-71 (7th Cir.1984) (using mace on inmate who refused to submit to VBC search by bending over and spreading buttocks, then entering cell and forcibly conducting the search, was not excessive force; "the chemical agent was used for failure of the inmate to obey a direct order and the use of mace was a reasonable response to the institution's legitimate security concern"); Poindexter v. Woodson, 510 F.2d 464 (10th Cir.1975) (permissible to use water hoses on inmates where force was necessary to control prison disruption); Smith v. Ball, No. 92-C-651 (E.D.Wis. June 17, 1993), 1993 U.S.Dist. Lexis 20396, (court enters summary judgment for prison officials after finding no Eighth Amendment violation where, following inmate's refusal to bend over and spread buttocks, guards had to forcibly strip inmate and perform VBC search), aff'd., No. 93-2526 (7th Cir. Nov. 15, 1994) (unpublished order); Geder v. Lane, 745 F.Supp. 538, 539-40 (C.D.Ill.1990) (no Fourth Amendment violation where inmate refused to bend over and spread buttocks, requiring tact team to perform forcible VBC search); Collins v. Schoonfield, 363 F.Supp. 1152, 1164-65 (D.Md.1973) (no constitutional violation where fire hose used to quell prison uprising); Poindexter v. Woodson, 357 F.Supp. 443, 451 (D.Kan.1973), aff'd., 510 F.2d 464 (10th Cir.1975) (inmates sprayed with power hose for approximately one minute; "the hoses were used not to harass or torment the general inmate population ..., but rather to quell disturbances"); Beishir v. Swenson, 331 F.Supp. 1227, 1235 (W.D.Mo.1971) (no Eighth Amendment violation where, in an attempt to quell continued disturbance, fire hoses with limited water pressure were used on inmates, who were holding mattresses against the cell bars to avoid the bursts of water; chemical mace was "next most severe nonlethal remedy").
 
 
 42
 Readily distinguishable are the cases finding a violation of the Eighth Amendment through a use of water hoses. See Campbell v. Grammer, 889 F.2d 797, 802 (8th Cir.1989) (violation of Eighth Amendment to use fire hoses on three inmates where district court found "there was absolutely no justification for this application of force," and inmates suffered back pain, blurred vision, and pain in ribs and thighs; "Although the injuries were not especially severe, they were sufficient to support the district court's finding of an Eighth Amendment violation"); Slakan v. Porter, 737 F.2d 368, 373-74 (4th Cir.1984) (violation of Eighth Amendment to use steady blasts of water from two high-pressure water hoses, tear gas, and use of billy clubs to "savagely" beat inmate, where inmate who had complained about missing his usual morning coffee was confined in one-man cell and posed no direct physical threat to others; supervisors also liable where they had fully supported use of high-pressure hoses in numerous cases, one of which involved spraying a handcuffed prisoner for 25 to 30 minutes ); Kirby v. Blackledge, 530 F.2d 583 (4th Cir.1976) (reversing summary judgment for prison officials after finding factual disputes remained in regard to whether an Eighth Amendment violation arose from the use of a high pressure water hose on one inmate for an hour, and on another inmate for 20 minutes because he would not give a radio to a guard; numerous due process violations also raise material fact questions). Even if a factfinder were to accept Gibbons' story, it could not find that the actions of the prison guards were anything other than a reasonable response to an escalating disruption in the prison.
 
 
 43
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Cir.R. 34(f). No such statement having been filed, the appeal is submitted on the briefs and the record
 
 
 [2]
 For the reasons discussed below, Jack Duckworth is dismissed as a respondent, and the parties are designated as plaintiff and defendants
 
 
 [3]
 The district court stated: "The court agrees with Gibbons that he was unreasonably denied access to potentially exculpatory information." The court also stated that while the CAB believed the videotape irrelevant, "the court finds just the opposite."
 
 
 [4]
 The district court construed a portion of the civil rights suit as a habeas corpus petition and thus the warden was brought in as respondent
 
 
 [5]
 On June 30, 1994, the district court denied Gibbons's request for the issuance of a certificate of probable cause, and stated in regard to the denial of his claim for damages: "The correctness of that ruling cannot now be doubted, see Heck v. Humphrey, 1994 U.S. Lexis 4824 (June 24, 1994), and for this reason the court concludes that an appeal could not be taken in good faith."
 
 
 [6]
 This case involves two different procedural due process rights. See Chavis v. Rowe, 643 F.2d 1281, 1286 (7th Cir.1981). Under Wolff, the inmate has a right to prepare the best defense he can, which in this case was hampered by the CAB's refusal to permit access to the tape. There is also a right to insure that the trier of fact considers all relevant evidence in reaching a conclusion of guilty or innocent, which in this case was affected by the CAB's refusal to review the videotape. However, the analysis applies equally to both rights under the facts presented here
 
 
 [7]
 Gibbons also claims that at the hearing the chairman told him that the Board did not have time to watch a videotape
 
 
 [8]
 Although Gibbons's conduct reports never mention visual body cavity searches and instead use boilerplate language that applied equally to all 28 inmates being charged, and the district court twice noted that the conduct report did not describe how Gibbons resisted the guards, Gibbons does not argue that he was given inadequate notice of the nature of the charges against him, or that the CAB's explanation of the evidence relied upon in finding him guilty was inadequate, and therefore we need not explore these issues
 
 
 [9]
 Here, perhaps, lies the crux of the problem in using 28 ready-made disciplinary conduct reports for all inmates on the segregation unit. Still, the CAB could have easily made up for the terse vagaries of the conduct report by detailing what conduct supported the "resisting" charge
 
 
 [10]
 That charge is defined by the prison as "physically resisting or fleeing a staff member in the performance of his/her duty."
 
 
 [11]
 Gibbons will have to confront the long-established rule that routine visual body cavity searches of inmates are generally permissible. Bell v. Wolfish, 441 U.S. 520, 561 (1979); Del Raine v. Williford, 32 F.3d 1024 (7th Cir.1994); Goff v. Nix, 803 F.2d 358 (8th Cir.1986). Perhaps not surprisingly, it is not unusual for prisoners to refuse orders related to VBC searches, although the courts continue to support the prisons' right to make such searches
 For example, in Soto v. Dickey, 744 F.2d 1260 (7th Cir.1984), the inmate refused to bend over and spread his buttocks, requiring guards to spray mace, then enter the cell and complete the search. "When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent of physical force." Soto, 744 F.2d at 1267. True, prison officials can attempt to wait out the inmate, hoping he will comply with the order at some point; however, "experience and common sense establish that a prison cannot be operated in such a way." Id. The court explained further:
 Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them. Someone must exercise authority and control. One can quickly reason what would happen in a maximum security prison without proper discipline.... [R]efusal and denial of authority places the staff and other inmates in danger ... [T]he institution cannot permit an inmate to violate a rule or disobey an order and ... action must be taken to compel compliance with a lawful order. Id.
 See also Smith v. Ball, No. 92-C-651 (E.D.Wis. June 17, 1993), 1993 U.S.Dist. Lexis 20396 (inmate's refusal to bend over and spread buttocks was grounds for discipline), aff'd., No. 93-2526 (7th Cir. Nov. 15, 1994) (unpublished order), 1994 U.S.App. Lexis 32897; Geder v. Lane, 745 F.Supp. 538, 539-40 (C.D.Ill.1990) (inmate refuses to bend over and spread buttocks; tact team called and VBC search forcibly performed; court upholds jury verdict which rejected inmate's argument that the tact team was "unnecessarily rough in forcing him to comply with the visual search"; the inmate "may not like the visual intrusion, but there is nothing unconstitutional about it and submitting peaceably would save him ... from being forced to comply with the policy"); Koss v. Michigan Dept. of Corrections, 184 Mich.App. 614, 459 N.W.2d 34 (1990) (upholding disciplinary board's finding that inmate disobeyed a direct order when he refused to bend over and spread buttocks as part of VBC search).
 
 
 [12]
 It might be asked whether the refusal to bend over during a strip search qualifies as "physically resisting staff." Generally, passive resistance is considered physical. See e.g., Ryan v. County of DuPage, 45 F.3d 1090, 1019 (7th Cir.1995) (under Illinois law, refusal to remove mask in courthouse constituted physical resistance, similar to "going limp"); Colon v. Schneider, 899 F.2d 660, 668 (7th Cir.1990) (use of mace after inmate refused to strip; permitting inmates to disobey invites physical confrontations between guards and inmates, and promotes unrest and violence). This is particularly so in a prison setting where passive physical resistance can "have a ripple effect throughout the prison, necessitating the use of additional prison staff if other prisoners joined in the passive resistance." Michenfelder v. Sumner, 860 F.2d 328, 336 (9th Cir.1988). See also Soto v. Dickey, 744 F.2d 1260 (7th Cir.1984). In fact that is exactly what happened here. The day before Gibbons was strip searched, the guards had attempted to effect a search in the unit, but after being resisted by several inmates, they were forced to wait and return the next day with a quick response team in place to achieve full compliance with the search orders
 
 
 [13]
 See, e.g., Armento-Bey v. Harper, 68 F.3d 215, 216 (8th Cir.1995); Gotcher v. Wood, 66 F.3d 1097, 1099 (9th Cir.1995); Colon v. Coughlin, 58 F.3d 865 (2d Cir.1995); Leonard v. Nix, 55 F.3d 370 (8th Cir.1995); Woods v. Smith, 60 F.3d 1161 (5th Cir.1995), Bryant v. Borg, (9th Cir. Aug. 7, 1995), 1995 WL 465791 (unpublished order); Stone-Bey v. Swihart, 898 F.Supp. 1287, 1295 (N.D.Ind.1995); Higgason v. Swihart, No. 93-CV-805 (N.D.Ind. May 11, 1995), 1995 WL 358769); Allen v. Crandel, No. 95-0673 (9th Cir. June 28, 1995), 1995 WL 392525, 1995 U.S.Dist. Lexis 9227; Ortiz v. McBride, No. 93-CV-643 (N.D.Ind. April 26, 1995), 1995 WL 429493, 1995 U.S.Dist. Lexis 10110; Hightower v. Vose, No. 93-0286 (D.R.I. March 16, 1995), 1995 WL 116395, 1995 U.S.Dist. Lexis 3368; Jones v. McBride, No. 93-CV-530 (N.D.Ind. Sept. 2, 1994), 1994 U.S.Dist. Lexis 19572
 
 
 [14]
 The fact that a less forcible alternative might have been successful does not create an Eighth Amendment claim. "[I]n ruling on a motion for a directed verdict ..., court must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury." Whitley, 475 U.S. at 322
 The same reasoning applies in a summary judgment setting: "Every disputed fact between altercants is not a material fact for purposes of summary judgment.... [The appellant/inmate] could have survived summary judgment here 'only if the evidence viewed in the light most favorable to him [went] beyond a mere dispute over the reasonableness of the force used and ... support[ed] a reliable inference of the wantonness in the infliction of pain") Miller v. Leathers, 885 F.2d 151, 154-55 (4th Cir.1989), quoting Brown v. Smith, 813 F.2d 1187, 1188 (11th Cir.1987).
 
 
 [15]
 The Eighth Amendment's prohibition of cruel and unusual punishment "necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.' " Hudson, 112 S.Ct. at 1000, quoting Whitley, 475 U.S. at 327
 We hesitate to call a high-powered water hose "de minimis" force, although with the absence of any allegation of harm suffered by Gibbons, the force may have been no more than de minimis. Cf. Hudson, 503 U.S. at 10 (the "blows directed at Hudson, which caused bruises, swelling, loosened teeth, and a cracked dental plate are not de minimis for Eighth Amendment purposes"); Thomas v. Stalter, 20 F.3d 298, 302 (7th Cir.1994) (punching inmate in face is not de minimis force); Lunsford v. Bennett, 17 F.3d 1574, 1582 (7th Cir.1994) (pouring a bucket of water over inmate's head is "a minor use of force that does not offend the conscience" and does not violate the Eighth Amendment); Miller v. Glanz, 948 F.2d 1562, 1567 (10th Cir.1991) (no excessive force where inmate disobeyed order to put hands behind his back and officers used de minimis force to enforce their order); Sardon v. Peters, No. 94 C 7505 (N.D.Ill. Oct. 13, 1995) (throwing spoiled milk on inmate is de minimis use of force), 1995 WL 609147 at * 11.